134 P.3d 216 (2006)
157 Wash.2d 33
Robert HARVEY and Marissa Harvey, individually and as husband and wife, and the marital community composed thereof, Respondents,
v.
THE COUNTY OF SNOHOMISH, a political subdivision of Washington State, Snohomish County Sheriff's Office, an agent of Snohomish County, Rick Bart, Snohomish County Sheriff, an agent and employee of Snohomish County, SNOPAC and the Board of Directors of SNOPAC, a political subdivision and agency of Snohomish County, and Jane Doe # 1, an employee of SNOPAC and an agent of Snohomish County, Petitioners.
No. 76575-8.
Supreme Court of Washington, En Banc.
Argued November 17, 2005.
Decided May 18, 2006.
Mark Richard Bucklin, Shannon Mary Ragonesi, Keating Bucklin & McCormack Inc. PS, Seattle, Robert Tad Seder, Civil Div. Snohomish County Prosecutor's, Everett, for Petitioners.
*217 Stephen Lionel Conroy, Attorney at Law, Lynnwood, for Respondents.
CHAMBERS, J.
¶ 1 Robert Harvey, his eight-month-old son, and Alex Keltz, a neighbor, were attacked by a disturbed stranger who claimed to be on a mission from God. They retreated into Harvey's home and called 911 for police assistance. The Snohomish County Police Staff and Auxiliary Service Center (SNOPAC), an entity created pursuant to an interlocal agreement that provides 911 emergency services to various public agencies and localities, including Snohomish County, took the call. In the approximately eight minutes between the call and the arrival of officers, the stranger broke into the home and Harvey shot him six times. Harvey later sued, claiming that the police failed to timely rescue him. We conclude that under the facts of this case, Harvey has failed to demonstrate that assurances were given by the 911 operator to his detriment and even if such assurances could be gleaned from the record, Harvey cannot, as a matter of law, show any breach of duty toward him. Because we find neither duty nor breach of duty, we do not reach the interlocal agreement issue.

FACTS
¶ 2 On November 17, 1999, at approximately 5:35 p.m., Keltz called 911 to report that a disturbed man, who had a painted face, appeared to be wearing a straight jacket, and claiming to be "serving God," was breaking into Harvey's condominium.[1] Harvey, Keltz, and Harvey's son were all inside Harvey's home at the time of the call. The 911 operator remained on the line with Keltz and at the same time informed a SNOPAC police dispatcher of the situation. At 5:38 p.m., the dispatcher, over radio, requested that all available law enforcement respond to Harvey's residence. Between 5:38 p.m. and 5:39 p.m., two Snohomish County sheriff deputies responded to the call and informed the dispatcher they were on their way to the scene. At approximately the same time, the operator informed Harvey (who had taken the phone from Keltz) that she had notified the police about the situation. The dispatcher advised the police that the suspect was threatening to shoot Harvey, was armed with a handgun, and was stating he wanted to die. Snohomish County Deputy Bynum was sent to get the ballistics shield from the precinct.
¶ 3 At 5:44:28 p.m., Snohomish County Deputy Durand arrived and began to set up a couple of blocks away from Harvey's residence while he waited for backup units to arrive. Deputy Durand reported that there was no place to set up right in front of Harvey's home without crossing the path of a potentially armed suspect, so officers set up down the street from Harvey's residence. At approximately 5:45 p.m., the operator informed Harvey that there were deputies in the area preparing to respond. At 5:46:09 p.m., Snohomish County Deputy Shaw arrived at the scene. Between 5:46:02-5:48:07 p.m., Harvey, who apparently had lost sight of the suspect, asked the operator whether he should go out on the porch to look for the man or if he should lock himself in the bathroom. The operator told Harvey he should do whatever he felt was most safe to do.
¶ 4 At 5:48:01 p.m., the dispatcher advised police that the suspect was attempting to get in through a window on the balcony. The operator told Harvey she had informed the deputies about the suspect's attempts to enter through the window. At 5:49:43 p.m., another deputy responded to the incident and asked if he should block off the street in front of Harvey's residence. Five seconds later, deputies stated they did not have time to block off the street, ordered all power cut, and moved in on the residence. At 5:50:17 p.m., two other deputies arrived with the ballistics shield. Ten seconds later, the operator stated that gunfire had been heard and they had lost phone contact with Harvey. *218 At approximately the same time, deputies moving in on the suspect discovered Harvey and Keltz making their way toward them. Harvey told the deputies that the suspect had been shot several times and was in his home. Four deputies entered Harvey's home and ordered the suspect not to move. However, despite the orders from the deputies and the extensive injuries to the suspect, the suspect attacked, grabbing Deputy Durand's leg in an attempt to bite him. The suspect was finally subdued and medical personnel arrived to provide treatment. Mercifully, neither Harvey, his son, nor Keltz sustained any physical injuries as a result of the incident.
¶ 5 Harvey sued Snohomish County, among others, for negligent infliction of emotional distress, alleging the county and the sheriff's department failed to rescue him, his son, and his neighbor. Harvey also filed civil rights claims. Defendants successfully removed the action to federal court, where the court dismissed Harvey's civil rights claims. The federal court returned the remaining state claims to Snohomish County Superior Court, whereupon, the trial court granted defendant's motion for summary judgment.
¶ 6 The Court of Appeals reversed in part and remanded, holding that Snohomish County cannot use its interlocal cooperation agreement to shield itself from its legal obligations and is, therefore, liable for SNOPAC's potential negligence. Further, the court held that it was a question of fact best left to a jury to decide whether the 911 operator gave Harvey express assurances that he justifiably relied upon to his detriment. Harvey v. Snohomish County, 124 Wash.App. 806, 818-19, 103 P.3d 836 (2004). We reverse.

ANALYSIS

STANDARD OF REVIEW
¶ 7 Summary judgment is proper when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 784, 30 P.3d 1261 (2001) (citing Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998)). The moving party bears the burden of demonstrating there is no genuine dispute as to any material fact. Id. at 784, 30 P.3d 1261. The appellate court engages in the same inquiry as the trial court when reviewing an order on summary judgment. Id. In addition, all facts and reasonable inference are considered in a light most favorable to the nonmoving party. Id.

DID SNOHOMISH COUNTY OWE A DUTY TO HARVEY?

PRIVITY
¶ 8 As a preliminary matter, we note there was sufficient contact between Harvey and the SNOPAC operator to establish privity. In Beal v. City of Seattle, 134 Wash.2d 769, 785, 954 P.2d 237 (1998), privity was established where the victim told the operator that her estranged husband had been threatening her. She identified her location, and the operator told her that police were being dispatched. Similarly, in this case, Harvey was in contact with the SNOPAC operator throughout the incident, stated his location, and in response, the dispatcher told Harvey multiple times that she had let the police know the nature of the incident, that they were in the area, and that they were setting up nearby. However, while Harvey can establish privity, Harvey cannot show that any alleged assurance made by the operator was false, unfulfilled, relied upon, or made to his detriment. See generally Beal, 134 Wash.2d 769, 954 P.2d 237.

EXPRESS ASSURANCE
¶ 9 Historically, this court has held in cases concerning 911 calls for police assistance, that the government has no duty to a member of the public unless an express assurance of assistance is made by the government to the caller. See Beal, 134 Wash.2d at 785, 954 P.2d 237. This court has dealt specifically with the express assurances requirement in the context of 911 calls for police assistance in three cases: Chambers-Castanes v. King County, 100 Wash.2d 275, 669 P.2d 451 (1983), Beal, and Bratton v. Welp, 145 Wash.2d 572, 39 P.3d 959 (2002). *219 In all three cases, this court found that assurances were made to the detriment of the caller when the operator told the callers police were dispatched when they had not been. See Chambers-Castanes, 100 Wash.2d at 279-80, 669 P.2d 451 (police received numerous calls about the incident, did not respond for an hour and a half, and, at one point, the operator told the caller that an officer had been dispatched but in fact was not); Beal, 134 Wash.2d at 774, 785, 954 P.2d 237 (the caller was told by the operator to wait in her car for the police to arrive, but the police were never dispatched and the caller was shot and killed); Bratton, 145 Wash.2d at 575, 39 P.3d 959 (the operator told the caller that "`if she or her family was threatened again that the police would be sent.'" Another call was made to report another threat, however, the operator did not send the police, and the caller was shot).
¶ 10 Unlike Chambers-Castanes, Beal, and Bratton, in this case, Harvey never received any assurance from the operator that was untruthful or inaccurate. Nor has Harvey shown that he relied on any assurance to his detriment. In other words, when the operator told Harvey she had notified police of the situation, she had.[2] When the operator told Harvey the police were in the area and officers were setting up, they were.[3]
¶ 11 Nevertheless, Harvey contends that he relied on the operator's assurances to his detriment when the operator asked Harvey to remain on the line on several occasions. However, Harvey never asked whether he should try to escape or remain in the condo, nor did the operator ever tell him that he should remain in the condo and wait for the police to arrive instead of escaping. Nor does Harvey even suggest that in the absence of the operator's request, he would have left the condo, especially knowing that there appeared to be a crazed man waiting outside. Simply put, no assurance was ever sought by Harvey and none was ever given by the operator. Furthermore, even if we assume the statements relied upon by the Court of Appeals created a duty, there is no showing the 911 operator ever breached that duty or that Harvey relied on those statements to his detriment.[4]

*220 INTERLOCAL AGREEMENT
¶ 12 The effect, if any, of the interlocal agreement was not raised nor argued by the parties at the trial court. Consequently, the record is void of evidence relating to the legal responsibilities and obligations, if any, imposed by the interlocal agreement. In addition, there is very little on the record outlining the nature of the relationship between Snohomish County and SNOPAC. It appears that issues relating to the interlocal agreement were raised for the first time by the Court of Appeals sua sponte. Given that we find there was no duty owed to Harvey, we find it unnecessary to consider this issue.[5]

CONCLUSION
¶ 13 In order to demonstrate that a duty has been created to respond to a 911 call for police assistance, a claimant must show that assurances were made to the detriment of the caller. A careful review of the record reveals that Harvey never received any assurance from the operator that was untruthful or inaccurate nor has he shown that he relied on any assurance to his detriment. Even if we were to agree with the Court of Appeals that express assurances were made by the 911 operator, there was never any breach of duty. On the contrary, in this case, the SNOPAC operator and the Snohomish County Sheriff's Office seemed to have acted swiftly and effectively throughout the entire 15 minutes between the initial call and the shooting. We reverse the Court of Appeals and remand for any proceedings consistent with this opinion.
Concurring: ALEXANDER, C.J., C. JOHNSON, MADSEN, BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ.
SANDERS, J. (concurring in result).
¶ 14 The majority concludes a duty to rescue exists only if an injured party detrimentally relies on a promise to rescue. I disagree. A duty to rescue exists when an injured party reasonably relies on a promise to rescue. However, because Robert Harvey fails to allege a breach of duty, I would also reverse the Court of Appeals. Accordingly, I concur in the result.
¶ 15 The majority holds no negligence liability exists because Snohomish County had no duty to rescue Harvey. The majority is incorrect. No negligence liability exists because Snohomish County was not negligent. Reasonable reliance on a promise to rescue creates a duty to rescue. But no liability exists without a breach.
¶ 16 Neither party disputes the relevant facts. Harvey requested police assistance. The Snohomish County Police Staff and Auxiliary Service Center (SNOPAC) operator promised police assistance. And the police provided timely assistance. Harvey argues the SNOPAC operator's promise to rescue created a duty to rescue. And he contends the SNOPAC operator breached that duty to rescue by advising him to remain in his home, rather than escape.
¶ 17 A duty to rescue existed because the police promised to rescue Harvey and Harvey reasonably relied on the promise. Under the "rescue doctrine," a duty to rescue exists when "a governmental entity or its agent undertakes a duty to aid or warn a person in danger and fails to exercise reasonable care, and the offer to render aid is relied upon by either the person to whom the aid is to be rendered or by another who, as a result of the promise, refrains from acting on the victim's behalf." Chambers-Castanes v. King County, 100 Wash.2d 275, 285 n. 3, 669 *221 P.2d 451 (1983). Snohomish County must concede Harvey reasonably relied on its promise of police assistance. Consequently, Snohomish County had a duty to exercise reasonable care in rescuing Harvey.
¶ 18 But no cause of action for negligence exists because Harvey fails to allege a breach of duty. "When a defendant undertakes a rescue, a special relationship develops, giving rise to actionable negligence if a defendant breaches the duty of care by failing to act reasonably." Folsom v. Burger King, 135 Wash.2d 658, 676, 958 P.2d 301 (1998) (emphasis added). Breach of duty is a question of fact.
¶ 19 As a general rule, questions of fact are reserved to the jury. However, "when reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law." Hartley v. State, 103 Wash.2d 768, 775, 698 P.2d 77 (1985). See also Hertog v. City of Seattle, 138 Wash.2d 265, 275, 979 P.2d 400 (1999).
"If all reasonable minds would conclude that the defendant failed to exercise ordinary care, the judge can find negligence as a matter of law. If no reasonable mind could find that the defendant failed to exercise ordinary care, the judge can find the absence of negligence as a matter of law. In any other case, negligence is an issue for the trier of fact . . . ."
Pudmaroff v. Allen, 138 Wash.2d 55, 68-69, 977 P.2d 574 (1999) (quoting Mathis v. Ammons, 84 Wash.App. 411, 418-19, 928 P.2d 431 (1996)). Here, no reasonable person could conclude the SNOPAC operator or the police failed to exercise reasonable care. No question of fact exists for the jury to decide.
¶ 20 A party is entitled to summary judgment on a question of fact when, "viewing the evidence most favorably to the nonmoving party, `there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'" Morse v. Antonellis, 149 Wash.2d 572, 574, 70 P.3d 125 (2003) (quoting Sing v. John L. Scott, Inc., 134 Wash.2d 24, 29, 948 P.2d 816 (1997)). Viewed in the light most favorable to Harvey, nothing in the record suggests Snohomish County failed to exercise reasonable care. Snohomish County is entitled to summary judgment because Harvey fails to identify a negligent act.
¶ 21 Accordingly, I concur in result.
NOTES
[1] There are minor discrepancies between the 911 transcriptions provided by Harvey and SNOPAC. Unless otherwise noted, for the purposes of this opinion, we cite to the transcript submitted by SNOPAC. Decl. of def. Thomas Howell, SNOPAC Mot. for Summ. J., Clerk's Papers (CP) at 201-03; Ex. A (CP at 204-18). Under either transcription version, we reach the same result. For ease of the reader, we have translated military time notation to Pacific standard time notation.
[2] "[5:38:15 Harvey] Hey, hello, is someone on their way?" CP at 208.

"[5:38:16 Operator] Robert, I've already let them [police dispatcher] know." CP at 208. Between 5:35 -:38 the operator communicated the incident to a dispatcher. CP at 226. Between 5:38-:39 a call by the dispatcher was placed to police over radio. Id.
[3] "[5:45:38 Operator] Alright Robert, well hang on, I know they're in the area." CP at 214.

"[5:45:40 Harvey] Ok, what's going on?" CP at 214.
"[5:45:42 Operator] I show that there are five deputies in that area." CP at 214.
At approximately 5:44, Deputy Durand had arrived at the scene to set up. CP at 132, 228. At around this time, additional deputies were in the area. CP at 228-32.
[4] While we disagree, the Court of Appeals held, Harvey, 124 Wash.App. at 815-18, ¶¶ 20-21, 103 P.3d 836, among other exchanges, that it was a question of fact for a jury to decide whether the following statements by the operator were relied upon to the detriment of Harvey. The Court of Appeals appears to cite to the 911 transcription submitted by plaintiff. Id. As stated above, under either version we reach the same conclusion:

[Keltz]: Ma'am, get a cop out here right now!
911: Okay [Keltz], I've already let them [the police] know. I've already let them know what's happening.
. . . .
[Keltz]: We have no freaking clue [who the intruder is]!
911: Okay. Hang on. I've let `em know, okay?
. . . .
[Harvey]: He [the suspect] still tried. I don't want to shoot him.
911: Yeah, I think that's a good idea, as soon as you see the police officers, go ahead and secure the gun and let me know ... but don't hang up on me, you have to let me know.
. . . .
911: Hang on, stay on the line, do not hang up with me, okay?
. . . .
[Harvey]: He's [the suspect is] rubbing on it [the window] hard. Oh, damn it, where are they?
911: Well you've seen them so you know that they're [the police] there.
[Harvey saw a police car drive by his residence that was not responding nor involved with the incident. Harvey and the operator mistook the apparent off-duty officer for a deputy actually responding to this incident.].
. . . .
[Harvey]: Oh [expletive], where are they at? Where in the hell are they at?
911: All right Robert, well, hang on, I know that they're [the police] are in the area, okay? ... Actually, there are five deputies in the area.
. . . .
. . . .
[Keltz]: in the background: Come on, where are the cops at?
911: They're there. Tell, tell [Harvey] ... they are definitely there, they're setting up now.
. . . .
. . . .
[Harvey]: He's [the suspect] pounding on my windows. Should, should we lock ourselves up in the bathroom or anything? Or ....
911: If you feel safe enough to go ahead and lock yourself up in the bathroom.
[Harvey]: The cops are here you said?
911: They're [the police] definitely there. Again, they're setting up.
[5] This court neither endorses nor rejects the reasoning and analysis of the Court of Appeals regarding RCW 39.34.030.