250 P.3d 491 (2011)
Gave Diana MUNICH, as Personal Representative for the Estate of William R. Munich, Respondent,
v.
SKAGIT EMERGENCY COMMUNICATIONS CENTER d/b/a Skagit 911, Skagit County, and Skagit County Sheriff's Office, Petitioners.
Nos. 64644-3-I, 64646-0-I.
Court of Appeals of Washington, Division 1.
April 11, 2011.
*492 Duncan Fobes, Rhianna Fronapfel, Patterson Buchanan Fobes Leitch & Kalzer, Shannon Ragonesi, Mark Bucklin, Keating Bucklin & McCormack Inc. PS, Seattle, WA, Paul Reilly, Attorney at Law, Anacortes, WA, for Appellants.
Ray Kahler, Stritmatter Kessler Whelan Coluccio, Hoquiam, WA, Kevin Coluccio, Paul Whelan, Stritmatter Kessler Whelan Coluccio, Seattle, WA, for Respondent.
SPEARMAN, J.
¶ 1 We are asked to decide on discretionary review whether, in order to satisfy the special relationship exception to the public duty doctrine, the Estate of William Munich must show that Munich received an express assurance from Skagit County that was false or inaccurate.[1] We hold that the Estate does not need to prove that the assurance was false or inaccurate, and affirm.

FACTS
¶ 2 On October 1, 2005, William Munich flew his plane to property that he and his wife, Gaye, owned in rural Skagit County. The only building on their property was a garage. At 5:57 p.m., Munich called his friend Bruce Heiner to tell him that a neighbor, Marvin Ballsmider, had just fired a shot at him. Heiner told Munich to call 911. At 6:00 p.m., according to the computer-aided dispatch (CAD) record, Munich called 911 and reported that a guy had pointed a rifle at him and "then he shot."[2] Munich said that Ballsmider "was aiming it directly" at him, from about 25 feet away. He reported that he was "rattled" and that Ballsmider was "an alcoholic." At 6:01 p.m., the 911 operator, Norma Smith, informed the Skagit County Sheriff's Office (SCSO) of the incident by entering a notation into the CAD system: "rps neighbor just pointed a rifle at him fired one shot." She entered the call as a priority two weapons offense. Meanwhile, Skagit 911 dispatcher Wes Norton dispatched SCSO deputy Dan Luvera to the call. Luvera began to drive from La Conner to Munich's property. At 6:02 p.m., the following exchange took place between Munich and Smith:
Smith: Ok, my partners already got . . . my partners already got a deputy that's headed towards you.
Munich: Ok, thank you[.]
Smith: Ok, so are you going to wait, you're going to wait there for contact?
Munich: Oh yeah, definitely[.]
Smith: Ok, did the, when the guy with the gun left, did he leave on foot or in a vehicle[.]
Munich: No, he lives right there, I know him, I mean he's standing right there right on the fence line
Smith: He's still standing there on the fence line?
Munich: I can't see him from here[.]
Smith: Ok. Are you in a house? Are you someplace safe?
Munich: I'm in my . . . I'm in my garage right now[.]
Smith: Ok, is there a house on that property or is there just a garage there?
Munich: There's just a garage, we're just in the process of building a . . ., we just finished the garage and now we're trying a house
Smith: Ok, you're going to wait there at the garage for contact then?
Munich: Yeah, I have a cable across the driveway so . . .
Smith: Ok, all righty, there's already a deputy that's enroute to you, ok?
Munich: Ok thank you[.]

*493 Smith: All righty, thank you, bye bye.
The call terminated at 6:03 p.m. At 6:04 p.m.,[3] according to his cell phone records, Munich called Heiner again. During this call, Munich told Heiner he was running down the road and that the "crazy bastard" still had his gun. Heiner told Munich to stop someone on the road and get out of the area, but Munich said cars were coming quickly and would not stop. Heiner heard gunshots. Munich said Ballsmider was at the top of the driveway and was reloading his gun. At 6:10 p.m., after hanging up with Heiner, Munich called 911. He told the 911 operator that Ballsmider, while driving a green station wagon, was chasing him up the road and shooting at him with a rifle. Munich told the operator his location and described Ballsmider's appearance. At 6:15 p.m., while Munich was still on the phone with the 911 operator, Ballsmider drove toward him and shot him through the car's open window. Munich died from his wounds. Luvera arrived on the scene at 6:18 p.m., approximately two minutes after the shooting, and arrested Ballsmider for Munich's murder. Luvera's arrival was approximately 18 minutes after Munich first called 911.
¶ 3 Munich's estate (the Estate) sued Skagit County, the Skagit County Sheriff's Office, and Skagit Emergency Communications Center (jointly, the County) for negligence in responding to the incident. The County brought a motion for summary judgment dismissal of the Estate's claims, arguing that under the public duty doctrine, it owed no legal duty to Munich. The County argued that the "special relationship" exception to the public duty doctrine did not apply because there was no express assurance of police assistance by the 911 operator and Munich did not rely on any express assurance to his detriment. It also argued that the Estate had to show that any express assurance was false or inaccurate. The trial court, granting summary judgment in part and denying it in part, ruled that a genuine issue of material fact existed on the issues of whether an express assurance was sought and given and whether Munich detrimentally relied on any such assurance.[4] It rejected the County's argument that Washington law requires a plaintiff to prove that an express assurance was false or inaccurate to give rise to a duty of care. The trial court certified its order. Skagit 911 and Skagit County sought discretionary review, which we granted on the narrow issue of whether the express assurance requirement of the special relationship exception requires a false or inaccurate assurance.

DISCUSSION
¶ 4 We examine issues of law de novo. State v. McCormack, 117 Wash.2d 141, 143, 812 P.2d 483 (1991). The County argues that under Washington law, the Estate is required to prove that any express assurance given by the 911 operator was false or inaccurate. The Estate, on the other hand, contends that it need only prove that an express assurance was given. We agree with the Estate and hold that where, as here, the alleged express assurance involves a promise of future action, a plaintiff is not required to prove that the express assurance was false or inaccurate to establish the existence of a special relationship.
¶ 5 Under the public duty doctrine, a plaintiff alleging negligence against a government entity must show that a duty was owed specifically to the plaintiff, not to the public in general. Taylor v. Stevens County, 111 Wash.2d 159, 759 P.2d 447 (1988) (citing J & B Dev. Co. v. King County, 100 Wash.2d 299, 304, 669 P.2d 468 (1983)). Whether a duty exists is a question of law. Osborn v. Mason County, 157 Wash.2d 18, 22-23, 134 P.3d 197 (2006). One exception to the public duty doctrine is where a "special relationship" exists between the plaintiff and the government entity. Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 784, 30 P.3d 1261 (2001). The special relationship exception is a "`focusing tool' used *494 to determine whether a local government `is under a general duty to a nebulous public or whether that duty has focused on the claimant.'" Taylor, 111 Wash.2d at 166, 759 P.2d 447 (quoting J & B Dev. Co., 100 Wash.2d at 304-05, 669 P.2d 468).
¶ 6 In order to establish that a special relationship exists, a plaintiff must prove three elements: (1) direct contact or privity between the public official and the plaintiff which sets the plaintiff apart from the general public, and (2) an express assurance given by the public official, which (3) gives rise to a justifiable reliance on the part of the plaintiff. Babcock, 144 Wash.2d at 786, 30 P.3d 1261. "The plaintiff must seek an express assurance and the government must unequivocally give that assurance." Id. at 789, 30 P.3d 1261.
¶ 7 We hold that the Estate is not required to prove, in addition to these three elements, that the express assurance was false or inaccurate. The cases cited by the County to argue otherwise are distinguishable. Initially, we note that all of the cases cited by the County apply the same three-part test we have identified for finding a special relationship: privity, express assurance, and detrimental reliance. See, e.g., Harvey v. Snohomish County, 157 Wash.2d 33, 38-41, 134 P.3d 216 (2006); Meaney v. Dodd, 111 Wash.2d 174, 178-79, 759 P.2d 455 (1988); Taylor v. Stevens County, 111 Wash.2d 159, 166, 759 P.2d 447 (1988); Vergeson v. Kitsap County, 145 Wash.App. 526, 539, 186 P.3d 1140 (2008); Smith v. State, 135 Wash.App. 259, 282, 144 P.3d 331 (2006). To the extent that courts have considered or addressed the falsity or inaccuracy of an express assurance, we conclude that such a consideration is not required in this context, where the alleged express assurance does not consist of providing information but is instead a promise of future action.
¶ 8 In several cases, the issue of whether information conveyed by the government to the plaintiff was false or inaccurate was central to the plaintiff's negligence claims. Meaney involved a negligence claim against a county in issuing a building permit to operate a mill and failing to provide accurate information during the application process. Meaney, 111 Wash.2d at 175, 759 P.2d 455. Taylor also involved a negligence claim against the county in issuing a building permit. Taylor, 111 Wash.2d at 160-62, 759 P.2d 447. And in Smith, the plaintiff alleged that the state was negligent in providing inaccurate information about appeal rights regarding her application for adoption assistance benefits. Smith, 135 Wash.App. at 263, 144 P.3d 331. In these cases, the government was involved with providing information in some capacity to the plaintiffs, and the plaintiffs' negligence claims depended on whether that information was accurate, true, or reliable. But here, the alleged assurance does not involve providing information. It involves a promise of future action.
¶ 9 A similar issue arose in Beal v. City of Seattle, 134 Wash.2d 769, 785-86, 954 P.2d 237 (1998), where the Washington Supreme Court considered the government's argument that where the issue involved reliance by a plaintiff on assurances, the information relied upon must be incorrect or there could be no cause of action. There, Melissa Fernandez called 911 from the apartment next to her estranged husband's to report that he would not let her retrieve her belongings. Id. at 773, 954 P.2d 237. She reported that her husband had been harassing and threatening her and that she had heard he had a gun. The conversation that the court found to contain express assurances was as follows:
911: Okay. Well I'll tell you what, we're going to send somebody there. Are you going to wait in number 4 [another apartment] until we get there?
CALLER: I'll be waiting outside in the front with my mom.
911: Okay. We'll get the police over there for you okay?
CALLER: Alright [sic], thanks.
Id. at 785, 954 P.2d 237. Approximately 20 minutes after this conversation, Fernandez's husband shot and killed her and then himself. By the time of the shootings, no police officer had been dispatched. The city, citing Meaney, argued that in any set of circumstances the information must be inaccurate at the time given, and argued that a prediction of future acts with no time requirements *495 is not inaccurate information. Id. at 786, 954 P.2d 237. But the court rejected this analysis:
This reading of Meaney is too narrow, because a definite assurance of future acts could be given without a specific time frame, with the government then failing to carry out those acts. Meaney specifically involved information about building permit requirements, which either is or is not accurate at the time given. The same cannot be said about assurances that future acts will occur.
Id. Significantly, the Beal court, in circumstances much like those in this case, declined to impose a requirement that the plaintiff prove that the assurance was false or inaccurate.
¶ 10 In Vergeson, another case cited by the County, the plaintiff alleged negligence against the county in failing to remove records of court-quashed warrants from its databases. There we applied the three-part test and affirmed the summary judgment dismissal of Vergeson's claims because she failed to identify any express assurances given to her by the county that it would remove her quashed warrant from the databases or that she would not be subsequently arrested. Id. at 541, 186 P.3d 1140. Although we noted that Vergeson had not shown that the county had provided her any incorrect information regarding the status of her warrants, the case turned on Vergeson's failure to identify any express assurances given to her by the county. Nowhere in our analysis did we suggest that in all cases, the plaintiff bears the additional burden of proving the falsity or inaccuracy of any express assurance given by the government.
¶ 11 Finally, of the cases cited by the County, Harvey is the most factually relevant, as it also involved a call to 911 for assistance.[5] In that case, the Washington Supreme Court held that the caller did not seek any express assurance, the 911 operator did not give an express assurance, and the caller did not rely on any assurance to his detriment. Harvey, 157 Wash.2d at 40, 134 P.3d 216. Furthermore, even if any assurance could be found, the caller could not show any breach of duty. Id. The County cites the following language from Harvey:
[I]n this case, Harvey never received any assurance from the operator that was untruthful or inaccurate. Nor has Harvey shown that he relied on any assurance to his detriment. In other words, when the operator told Harvey she had notified police of the situation, she had. When the operator told Harvey the police were in the area and officers were setting up, they were.
Id. at 39, 134 P.3d 216 (footnotes omitted). The Court also wrote:
In order to demonstrate that a duty has been created to respond to a 911 call for police assistance, a claimant must show that assurances were made to the detriment of the caller. A careful review of the record reveals that Harvey never received *496 any assurance from the operator that was untruthful or inaccurate nor has he shown that he relied on any assurance to his detriment.
Id. at 41-42, 134 P.3d 216. We do not view this language as holding that the falsity or inaccuracy of an express assurance is an additional element necessary to find a special relationship. Rather, it supports the Court's point that there was no express assurance upon which the plaintiff detrimentally relied, because the 911 operator statements were not an express assurance, but instead simply informed him, accurately, of developments in the situation.
¶ 12 In sum, we hold that here, where the alleged express assurance involved a promise of future action, the Estate is not required to show that the express assurance was false or inaccurate in order to establish the existence of a special relationship. The cases repeatedly employ the same three-part test, which does not require a plaintiff to show the falsity or inaccuracy of an assurance. Based on our holding, we conclude that the trial court did not err in finding that there were genuine issues of material fact regarding the existence of a special relationship between William Munich and Skagit County.
¶ 13 Affirmed.
WE CONCUR: BECKER and GROSSE, JJ.
NOTES
[1] The County also sought review of the trial court's ruling denying the County's motion to strike the Declaration of Paul D. Linnee, but we deny review of that ruling. The County fails to show obvious or probable error under RAP 2.3(b), and the Linnee declaration is not relevant or necessary to our substantive ruling.
[2] Munich's cell phone statement recorded the call as being made at 5:59 p.m.
[3] This would have been at approximately 6:05 p.m. according to the CAD system, if the cell phone times were consistently one minute ahead of the CAD times.
[4] The trial court granted the County's motion for summary judgment to dismiss the Estate's claim based on the rescue doctrine.
[5] In Harvey, Robert Harvey, his infant son, and their neighbor Alex Keltz were inside Harvey's home when a stranger who claimed to be "serving God" began breaking in. Harvey, 157 Wash.2d at 35, 134 P.3d 216. Keltz called 911 at approximately 5:35 p.m. The operator, while on the line with Keltz, informed a police dispatcher of the situation, and at 5:38 p.m., the dispatcher requested law enforcement to respond. Id. at 35-36, 134 P.3d 216. Within one minute, two sheriff deputies responded to the call and informed the dispatcher that they were on their way. Around this time, the 911 operator informed Harvey that police had been notified. The dispatcher advised police that the suspect was armed with a handgun and threatening to shoot Harvey. At 5:44 p.m., a deputy arrived and began setting up a couple blocks away from the residence while waiting for backup to arrive. Id. at 36, 134 P.3d 216. At 5:46 p.m., another deputy arrived. Harvey had lost sight of the suspect at this point and asked the operator whether he should go out on the porch to look for the suspect or lock himself in the bathroom. The operator told Harvey to do whatever he felt was most safe. The suspect attempted to enter the house through a window. At 5:49 p.m., deputies began to move in on the residence. Within a minute, other deputies arrived with a ballistics shield, and the operator stated that gunfire had been heard and telephone contact with Harvey was lost. Id. at 36-37, 134 P.3d 216. Deputies saw Harvey and Keltz coming toward them, and Harvey said that the suspect was inside the home and had been shot several times. The deputies went inside and subdued the suspect. None of the victims were physically injured. Harvey sued various parties for negligent infliction of emotional distress.