# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BRENT RYAN, individually, and as guardian for A.R., a minor, and B.D., a minor, and as Personal Representative of the ESTATE OF TERESA RYAN, | No. 50792-7-II |
| Respondent, | |
| v. | |
| PIERCE COUNTY, a government entity, | UNPUBLISHED OPINION |
| Petitioner. | |

MELNICK, J. — Austin Nelson shot and killed Teresa Ryan, the mother of his former girlfriend, B.D. Brent Ryan, on behalf of himself, his daughter A.R., his ward B.D., and Teresa's[1] Estate, sued Pierce County, alleging that the County's negligence caused Teresa's death.

The trial court ruled that the public duty doctrine did not apply and denied the County's summary judgment motion. We granted discretionary review and now reverse and remand for the trial court to enter summary judgment for the County.

---

[1] To avoid confusion, we refer to Brent and Teresa Ryan by their first names, or the respondents collectively as "the Ryans." We intend no disrespect.

FACTS

I.  INCIDENT

In September 2015, B.D., then 15, met Nelson, then 19. They began a sexual relationship. The Ryans found out about this relationship and told B.D. to end it, but she continued the relationship and hid it from her parents until January 8, 2016.

On January 8, B.D. broke up with Nelson. Seven days later, someone broke the windows and slashed the tires of B.D.'s car in her high school parking lot. A deputy reported to the school and observed the vandalized vehicle. The deputy talked to both B.D. and Brent. B.D. told the responding officer that she believed Nelson had committed the vandalism; however, she did not explain why she believed him to be a suspect.

Brent told the deputy that he also believed Nelson to be a suspect in an ongoing burglary investigation where guns had been taken from the Ryans' home.[2] The deputy looked at B.D. and said, "'Your parents are right. This is a very bad guy, and you shouldn't be hanging out with him. As a matter of fact, I think I want to go get this guy.'" Clerk's Papers (CP) at 59. Brent understood the deputy to mean that Nelson was "something that we need to deal with." CP at 94.

Later that evening, Brent researched Nelson on social media. The Ryans called 911 to provide additional information, including information about Nelson's car, address, work, and the fact that a neighbor had seen Nelson's car around the time of the burglary. The Ryans wanted to make the police "move quicker." CP at 71.

---

[2] The Ryans reported the burglary on December 8, 2015. At the time, they did not have any suspect information for the police.

At the same time, the Ryans also reported that Nelson and B.D. had sexual intercourse the previous September, before B.D. had turned sixteen, and that they wished to press statutory rape charges. The police noted this activity in their report, but told the Ryans that little was likely to come of it because the allegation was so old.

The police told B.D. she could get a protective order to prevent Nelson from contacting her. They notated Nelson's "unconfirmed address" and work information. CP at 219. When the deputies left that night, they told the Ryans they would enter the information, but that little was likely to come of it. The Ryans were frustrated by the police inaction.

The day after the automobile vandalism, B.D. began receiving text messages from an unfamiliar number. The sender threatened to post explicit images and videos of her on the internet unless she provided money and drugs.

The following day, someone posted explicit images and videos of B.D. on the internet. The Ryans again called 911. They showed the police the images and videos and told them, "'This is obviously escalating.'" CP at 93. The Ryans again said they believed Nelson had burglarized their home and vandalized B.D.'s car.[3] One of the deputies said it would take a couple days to get the case to a detective. When the deputies left, it was Brent's understanding that police would not arrest Nelson that night and it would take a couple more days before anything would happen.

The next day, Nelson shot and killed Teresa.

---

[3] The record is unclear as to who sent the threats and posted the images and videos. It is also unclear whether the Ryans told police they had come from Nelson. The Ryans do not allege that police made any express assurances related to this incident.

3

II.    LAWSUIT

The Ryans sued Pierce County, alleging that the Pierce County Sheriff Department's negligence caused Teresa's death.

Brent stated in a sworn declaration that he specifically identified Nelson to police as the "presumed robber" after items were stolen from the Ryan home in December, more than a month before the murder.  CP at 283.  He also said he contacted the police department about Nelson regarding threatening text messages Nelson had sent to B.D. the week before the murder.  He stated that, on the date of the vandalism, he reported threats to post child pornography on the internet, that Nelson "was again specifically disclosed and discussed," and that the sheriff "specifically informed [him] that he wanted to, and would go get, Nelson."  CP at 283.  Brent said he "continued to rely on the fact that [he] specifically identified the threats, and person making the threats, to the department that the Sheriffs would take action to protect [his] family."  CP at 283.

Brent stated that someone posted the explicit images and videos the day after the vandalism.  He said he contacted the sheriff's department that day and "continued to rely on the police for protection."  CP at 283.  Brent said the sheriff "was again summoned to our home" the next day for "additional threats and escalating troublesome conduct of Nelson" and that he "continued to rely on the department to protect my family."  CP at 284.  Brent stated, "Throughout the time frame I dealt with the police, I was given assurances that they would take action against Nelson for his conduct in order to protect my family" and that the Ryans "relied on th[o]se assurances to protect our family."  CP at 284.

In his deposition, Brent repudiated all of the above statements.  Brent said that no one had mentioned Nelson's name to police until the vandalism incident.  Brent did not know about any threatening text messages until the following day and he waited another day after that to report the

4

threats to law enforcement. He clarified that the Ryans had exactly three interactions with the police regarding Nelson before the murder. He stated that the only statement of assurance any police officer ever made was the statement, "I really want to go get this guy" after the vandalism. CP at 112.

The Ryans also submitted a declaration from a criminal justice expert who stated, in his opinion, "the Pierce County Sheriff Department had enough information before Jan. 18, 2016 to arrest Mr. Nelson on at least a charge of stalking, if not other crimes." CP at 280. He stated, "A reasonable investigator would have put the pieces together and realized the break-in and vandalism were related to the stalking and harassment, especially since the family reported that Mr. Nelson was the likely suspect." CP at 280. The expert said that the police gave the Ryan family a "false sense of security," which "created a significant and recognizable danger" to the family. CP at 280.

The trial court struck both Brent's and the expert's declarations.

The County moved for summary judgment based on the public duty doctrine. It argued that it had no special relationship with Teresa. The court denied the motion for summary judgment. The County sought discretionary review of the order denying summary judgment and we granted it.

ANALYSIS

I    LEGAL PRINCIPLES

We review a denial of summary judgment de novo, performing the same inquiry as the trial court. *Robb v. City of Seattle*, 176 Wn.2d 427, 432, 295 P.3d 212 (2013). Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012). We consider all facts submitted and all reasonable

5

inferences from the facts in the light most favorable to the nonmoving party. *Rublee v. Carrier Corp.*, 192 Wn.2d 190, 199, 428 P.3d 1207 (2018).

"'In an action for negligence a plaintiff must prove four basic elements: (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause.'" *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008) (quoting *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996)). Whether "an actionable duty was owed to the plaintiff is a threshold determination" that is a question of law we review de novo. *Munich*, 175 Wn.2d at 877.

II.      STRICKEN DECLARATION

The County contends that, in considering its summary judgment motion, we should ignore any written declaration that contradicts the declarant's sworn deposition testimony. In its reply brief, it additionally argues that we should not consider stricken declarations. We agree that the trial court properly struck Brent's declaration. We do not consider it.

When ruling on a summary judgment motion, we view the facts in the light most favorable to the nonmoving party. *Rublee*, 192 Wn.2d at 199. In doing so, we examine "*all* the evidence presented to the trial court, including evidence that ha[s] been redacted." *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). We review de novo each trial court ruling made in conjunction with the summary judgment motion, such as the order striking the declarations in this case. *Folsom*, 135 Wn.2d at 663.

The court cannot consider inadmissible evidence when ruling on a motion for summary judgment. *Davis v. Fred's Appliance, Inc.*, 171 Wn. App. 348, 357, 287 P.3d 51 (2012). We review admissibility of evidence in summary judgment proceedings de novo. *Davis*, 171 Wn. App. at 357.

"[G]enuine issues of material fact cannot be created by a declarant who submits an affidavit that contradicts his or her own deposition testimony." *Selvig v. Caryl*, 97 Wn. App. 220, 225, 983 P.2d 1141 (1999). "Genuine issues of material fact also cannot be created by conclusory statements of fact." *Baldwin v. Silver*, 165 Wn. App. 463, 472, 269 P.3d 284 (2011).

The Ryans rely extensively on statements from Brent's declaration. These statements include that the Ryans reported to police that Nelson had robbed them the month before the murder, that Nelson threatened B.D. a week before the murder and the Ryans reported these threats to police, and that police repeatedly assured the Ryans they would take action against Nelson.

Brent repudiated all of these statements in his deposition. He acknowledged that he had first contacted police about Nelson after the vandalism and that the only "assurance" any deputy ever offered him was that he wanted to "go get" Nelson. CP at 112. The Ryans may not create a genuine issue of material fact by relying on statements from a declaration that Brent specifically stated were false.[4] We affirm the order striking Brent's declaration and do not consider it in reviewing the summary judgment order.

---

[4] The trial court also struck the expert's declaration which stated that the County's inaction fell below the standard of care in failing to take action against Nelson. The expert based his opinions partially on facts from the complaint that were later repudiated by Brent's deposition. To the extent it is based on accurate facts, the expert declaration concerns only whether the County acted reasonably in its response to the Ryans' complaints about Nelson. Because nothing in the declaration concerns whether police offered the Ryans express assurances or the Ryans relied on such assurances, this declaration does not affect our public duty doctrine analysis.

III.     PUBLIC DUTY DOCTRINE

A.     Legal Principles

Local governments are "liable for damages arising out of their tortious conduct, or the tortious conduct of their past or present officers, employees, or volunteers while performing or in good faith purporting to perform their official duties, to the same extent as if they were a private person or corporation."   RCW 4.96.010(1).   However, when a negligence defendant is a governmental entity, the plaintiff must show that the duty breached was owed to him or her in particular and was not a breach of a duty owed to the public in general.  *Cummins v. Lewis County*, 156 Wn.2d 844, 852, 133 P.3d 458 (2006).   This requirement is known as the "public duty doctrine."

> Under the public duty doctrine, no liability may be imposed for a public official's negligent conduct unless it is shown that "the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (*i.e.*, a duty to all is a duty to no one)."

*Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988) (quoting *J & B Dev. Co. v. King County*, 100 Wn.2d 299, 303, 669 P.2d 468 (1983)).  The public duty doctrine "is a focusing tool used to determine whether the defendant 'owed a duty to a nebulous public or a particular individual.'"  *Munich*, 175 Wn.2d at 878 (quoting *Osborn v. Mason County*, 157 Wn.2d 18, 27, 134 P.3d 197 (2006)).

B.     SPECIAL RELATIONSHIP EXCEPTION

Four exceptions to the public duty doctrine include "(1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) a special relationship."  *Munich*, 175 Wn.2d at 879.  The Ryans contend that the special relationship exception applies in this case.

A special relationship will exist and give rise to an actionable duty where the plaintiff shows "(1) direct contact or privity between the public official and the plaintiff that sets the plaintiff apart from the general public, (2) an express assurance given by the public official, and (3) justifiable reliance on the assurance by the plaintiff." *Munich*, 175 Wn.2d at 879.

Because the County never offered the Ryans any "express assurance" and the Ryans did not "justifiably rely" on such an assurance, the special relationship exception does not apply in this case and we reverse.

### 1.    Express Assurance

The Ryans must show that the government unequivocally offered them an express assurance. *See Cummins*, 156 Wn.2d at 855. "'A government duty cannot arise from implied assurances.'" *Cummins*, 156 Wn.2d at 855 (quoting *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 789, 30 P.3d 1261 (2001)).

In *Cummins*, 156 Wn.2d at 848, a man called 911, stated an address, and said "heart attack," then hung up before the dispatcher could respond. The court held that an "inherent" or an "implied" assurance does not provide "a sufficient basis for finding an actionable duty under the special relationship exception." *Cummins*, 156 Wn.2d at 856. Because the plaintiff did not show that "the 911 operator gave Mr. Cummins an unequivocal statement that assistance would be forthcoming," the court concluded there had been no express assurance and the special relationship exception did not apply. *Cummins*, 156 Wn.2d at 856.

In *Harvey v. Snohomish County*, 157 Wn.2d 33, 35, 134 P.3d 216 (2006), the plaintiff called 911 to report a disturbed man breaking into his home. The dispatcher told the plaintiff that she had informed police about the situation and then later told him police were in the area setting up. *Harvey*, 157 Wn.2d at 39. Harvey "*never* asked whether he should try to escape or remain in

9

the condo, nor did the operator *ever* tell him that he should remain in the condo and wait for the police to arrive instead of escaping." *Harvey*, 157 Wn.2d at 40. Accordingly, "no assurance was ever sought by Harvey and none was ever given by the operator." *Harvey*, 157 Wn.2d at 40.

In this case, the only alleged assurance any Pierce County deputy made to the Ryans was the statement in the High School parking lot after the vandalism: "I really want to go get this guy." CP at 112.[5] Brent clarified that the deputy said he *wanted* to go get Nelson but did not state that he *would* do so. Like *Cummins*, the deputy in this case did not give Brent an "unequivocal statement that assistance would be forthcoming." 156 Wn.2d at 856. The deputy's statement did not suggest that he would act in any specific manner.

The evening of the vandalism, when deputies reported to the Ryans' 911 call about the September statutory rape, they told the Ryans that nothing was likely to come of it. The night before the murder, the deputies told the Ryans it would take a few days to get the case to a detective. The Ryans were frustrated with the lack of police action.

Because the police did not provide any express assurances to the Ryans or B.D. about Nelson prior to his murdering Teresa, the special relationship exception to the public duty doctrine does not apply. The County did not owe the Ryans any duty beyond that it owed to the public generally.

### 2. Justifiable Reliance

The county also contends that the Ryans did not justifiably rely on the deputy's statement that he wanted to go get Nelson. We agree.

---

[5] At oral argument, the Ryans conceded that they were relying on this statement as the only express assurance anyone from Pierce County ever offered.

Whether a party justifiably relies upon information is a "'question of fact generally not amenable to summary judgment.'" *Woods View II, LLC v. Kitsap County*, 188 Wn. App. 1, 28, 352 P.3d 807 (2015) (quoting *Babcock*, 144 Wn.2d at 792). The plaintiff must show that he or she relied on the express assurance to his or her detriment. *Harvey*, 157 Wn.2d at 39-40.

The only assurance the plaintiffs allege they received is the deputy's statement that he "want[ed] to go get this guy" in the parking lot after the vandalism. CP at 112. The Ryans actions after this statement do not suggest that they relied on the deputies going to arrest Nelson after the deputy made that statement.

That same night, the Ryans called 911 to offer more information about Nelson and attempt to press charges for Nelson's statutory rape of B.D. the previous September to make police "move quicker." CP at 71. When officers left that evening, they told the Ryans that little was likely to come of the statutory rape allegation. The Ryans were frustrated by the police inaction.

After the deputies left the Ryans' residence the night before the murder, Brent understood that they would not arrest Nelson that night. The police said it would take a few days to get the case to a detective who would follow up further. When asked, "And you did not rely on [police] doing something quickly? You were frustrated that they weren't doing something quickly?" Brent responded, "Correct." CP at 113.

We conclude that the Ryans have not shown that they justifiably relied on any express assurance by the County.

## CONCLUSION

Because the special relationship exception to the public duty doctrine does not apply in this case, the County did not owe the Ryans any duty beyond its duty to the general public. We reverse and remand for the trial court to enter summary judgment for the County.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Worswick, P.J.

Sutton, J.