[No. 85984-1.   En Banc.]
Argued May 3, 2012.   Decided November 1, 2012.

GAYE DIANA MUNICH, *as Personal Representative,*
*Respondent,* v. SKAGIT EMERGENCY
COMMUNICATIONS CENTER ET AL.,
*Petitioners.*

872

*Shannon M. Ragonesi* and *Mark R. Bucklin* (of *Keating Bucklin & McCormack Inc.*); *Rhianna M. Fronapfel* (of *Bennett Bigelow & Leedom PS*); and *Duncan K. Fobes* (of *Patterson Buchanan Fobes Leitch & Kalzer PS*), for petitioners.

*Ray W. Kahler, Kevin Coluccio*, and *Paul W. Whelan* (of *Stritmatter Kessler Whelan Coluccio*), for respondent.

*Robert M. McKenna, Attorney General*, and *Richard S. Puz* and *Jennifer S. Meyer, Assistants*, on behalf of Washington State Patrol, amicus curiae.

874

*George M. Ahrend* and *Bryan P. Harnetiaux* on behalf of Washington State Association for Justice Foundation, amicus curiae.

¶1 FAIRHURST, J. — This case involves the special relationship exception to the public duty doctrine. One of the elements necessary to satisfy the special relationship exception requires an express assurance by the defendant. The plaintiff in this case alleges a 911 operator negligently responded to an emergency call by coding (or prioritizing) it incorrectly, thereby causing a delayed response. The operator correctly informed the caller help was on the way, though the operator made no time estimate or reference to the call's priority.

¶2 On summary judgment, the defendant argued express assurances must be false or inaccurate in order to satisfy the exception. The trial court and Court of Appeals disagreed. We affirm and hold where the express assurance promises action there is no falsity requirement because the assurances may be superficially correct but negligently fulfilled. The accuracy, or lack thereof, of an assurance has no bearing on the issue of whether an actionable duty was established.

## I. FACTS AND PROCEDURAL HISTORY

¶3 William R. Munich was shot and killed by his neighbor, Marvin Ballsmider, approximately 18 minutes after he placed his first shaken phone call to Skagit Emergency Communications Center (Skagit 911). The tragic event began on rural property Munich and his wife owned on Lake Campbell in Skagit County. Munich flew his float plane to the property, and at some point thereafter Ballsmider pointed a rifle in Munich's direction, fired, and

missed. The two had been in a property dispute related to access to a driveway and Ballsmider's property.

¶4 After the first shot, Munich called his friend, Bruce Heiner. Heiner advised Munich to call 911 to get police assistance. Munich called 911. He told Norma Smith, a Skagit 911 call taker (or operator), exactly what happened—his neighbor pointed a rifle at him and fired a shot from about 25 feet away. Munich also informed Smith that he was hiding in his garage, the only structure on his property. The garage contained three unlocked vehicles with the keys located inside each.

¶5 Smith assured Munich that law enforcement was on the way, stating, "[M]y partner[1] [has] already got a deputy that's headed toward[ ] you." Clerk's Papers (CP) at 112. Smith then asked, "Ok, so are you going to wait . . . there for contact?" *Id.* Munich responded, "Oh yeah, definitely." *Id.* Smith later confirmed for a second time that Munich would wait for law enforcement in the garage and again assured him, "Ok, all righty, there's already a deputy that's en route to you, ok?" *Id.* Munich again replied, "Ok, thank you." *Id.*

¶6 Smith entered the call as a priority two weapons offense rather than a priority one emergency call. Based on the priority two code, the dispatched deputy, Dan Luvera, did not activate his emergency lights and only traveled slightly over the speed limit.

¶7 About seven minutes later, Munich again called 911. Tammy Canniff took the second call, and Munich told her that Ballsmider came into the garage. He stated he was now on Highway 20 running away from Ballsmider who was following and shooting. Munich said Ballsmider shot at him around a dozen times. The dispatcher informed Deputy Luvera of these facts, and Deputy Luvera consequently activated his emergency lights and siren and increased his

---

[1] A 911 call taker answers phone calls, obtains information from the caller, then codes, or prioritizes, the calls based on urgency. The call taker relays that information to a dispatcher who is responsible for dispatching calls to the sheriff's office. Smith's "partner" was the Skagit 911 dispatcher.

speed. While on the phone with Skagit 911, Munich described how Ballsmider was chasing him down in a car while firing a gun out of the open window. The second call ended with the sound of Munich being fatally shot on the highway. Deputy Luvera arrived two minutes later and arrested Ballsmider for Munich's murder. Munich was running toward the direction from which Deputy Luvera arrived.

¶8 Munich's estate (the Estate) sued Skagit County, the Skagit County Sheriff's Office, and Skagit Emergency Communications Center (hereinafter the County) for wrongful death, alleging the County negligently responded to the incident. The Estate presented expert testimony opining that Munich's initial call should have been coded as priority one. Additional evidence suggested that had the call been coded as priority one, Deputy Luvera would have arrived on the scene before Munich was chased down and shot.

¶9 The County moved for summary judgment dismissal of the Estate's claims, asserting it was not liable for Munich's death under the public duty doctrine. The County argued, in relevant part, that the special relationship exception to the public duty doctrine was not satisfied because the County provided no inaccurate or false information that Munich had detrimentally relied on. The trial court denied summary judgment, ruling the special relationship exception does not require false or inaccurate assurances. It further ruled the Estate alleged facts and argument satisfying the special relationship exception. The Court of Appeals affirmed, holding that where an express assurance involves a promise of future action, a plaintiff does not need to show the assurance was false or inaccurate to establish a special relationship. We granted the County's petition for review, *Munich v. Skagit Emergency Commc'ns Ctr.*, 172 Wn.2d 1026, 268 P.3d 225 (2011), and now affirm.

## II. ISSUE

¶10 Must a plaintiff show a 911 operator's assurances promising action were false or inaccurate to establish a special relationship under the public duty doctrine?

## III. ANALYSIS

¶11 On the narrow issue before us, we hold express assurances promising action need not be false or inaccurate as a matter of law to satisfy the special relationship exception to the public duty doctrine. When a 911 operator assures a caller help is on the way, as in this case, truth or falsity is not determinative because the government actor may be negligent in fulfilling that assurance.

A. Falsity Is Not a Requirement To Establish an Express Assurance under the Special Relationship Exception to the Public Duty Doctrine

1. *Standard of review*

¶12 When reviewing an order on summary judgment, we engage in the same inquiry as the trial court. *Cummins v. Lewis County*, 156 Wn.2d 844, 852, 133 P.3d 458 (2006). Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*; CR 56(c). All facts and reasonable inferences are considered in a light most favorable to the nonmoving party. *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 784, 30 P.3d 1261 (2001). In a negligence action, whether an actionable duty was owed to the plaintiff is a threshold determination. *Id.* That determination is a question of law reviewed de novo. *Cummins*, 156 Wn.2d at 852.

2. *The Estate alleged facts sufficient to establish an actionable duty under the special relationship exception*

■■ ¶13 Municipal corporations are liable for damages arising out of their tortious conduct, or the tortious conduct of their employees, to the same extent as if they were a private person or corporation. RCW 4.96.010(1). When the defendant in a negligence action is a governmental entity, the public duty doctrine provides that a plaintiff must show the duty breached was owed to him or her in particular, and was not the breach of an obligation owed to the public in general; i.e., a duty owed to all is a duty owed to none. *Babcock*, 144 Wn.2d at 785; *Beal v. City of Seattle*, 134 Wn.2d 769, 784, 954 P.2d 237 (1998) (citing *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988)). This doctrine "recognizes that a fundamental element of any negligence action is a duty owed by the defendant to the plaintiff." *Meaney v. Dodd*, 111 Wn.2d 174, 178, 759 P.2d 455 (1998). In this way, the public duty doctrine is a focusing tool used to determine whether the defendant "owed a duty to a 'nebulous public' or a particular individual." *Osborn v. Mason County*, 157 Wn.2d 18, 27, 134 P.3d 197 (2006) (internal quotation marks omitted) (quoting *Taylor*, 111 Wn.2d at 166). In this case, the County owed a statutory duty to the general public, under RCW 36.28.010, to preserve the peace and arrest those who disturb it. RCW 38.52.020 similarly provides for emergency management by the State and the creation of local organizations for emergency management in the political subdivisions of the state, for many reasons, including to protect the public peace, health, and safety, and to preserve the lives and property of the people of the state. Skagit 911 was formed to provide these necessary services.[2]

---

[2] The County's duty in this case was mandated by statute; no common law duty is at issue.

■ ¶14 There are four exceptions to the public duty doctrine: (1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) a special relationship. *Cummins*, 156 Wn.2d at 853. If any one of the exceptions applies, the government is held as a matter of law to owe a duty to the plaintiff. *Id.* The only exception at issue on appeal is the special relationship exception.

■ ■ ¶15 A special relationship between a municipality's agents and a plaintiff will exist and thereby give rise to an actionable duty, if three elements are established: (1) direct contact or privity between the public official and the plaintiff that sets the plaintiff apart from the general public, (2) an express assurance given by the public official, and (3) justifiable reliance on the assurance by the plaintiff. *Babcock*, 144 Wn.2d at 786. It is undisputed that Munich had direct contact with Skagit 911, satisfying the first element of the exception. Further, the question of whether Munich detrimentally relied on assurances is a question of fact generally not amenable to summary judgment. *Beal*, 134 Wn.2d at 786-87.

¶16 The County argues the Estate must prove express assurances given by the government were false or inaccurate in order to establish the second element of the special relationship exception. It further reasons that, regardless of the coding decision, no special relationship was established because the 911 call taker's assurances to Munich were technically true (i.e., Deputy Luvera was in fact traveling to the scene, even if it was at a slower pace because of the priority two coding). We disagree. While some of our cases have considered or addressed the falsity or inaccuracy of an express assurance, that consideration has never been a necessary element, nor should it be, when the government is promising action.

¶17 The County's argument hinges on language stemming from cases that involved the public duty doctrine but that are distinguishable from the present context. In particular, the County relies on language from *Meaney*, 111

Wn.2d 174. The issue in that case was whether a special relationship was established where the county issued a special use permit to a sawmill operator. The operator later sued the county for negligence after it was determined the sawmill could not be operated within county noise limits. We said that in certain circumstances the builder is owed a particular duty and can justifiably rely on the government's assurances. *Id.* at 180. The County relies on the following language from that case:

> It is only where a direct inquiry is made by an individual and *incorrect information* is clearly set forth by the government, the government intends that it be relied upon and it is relied upon by the individual to his detriment, that the government may be bound.

*Id.* (emphasis added). There, we held no special relationship was established because the operator did not make any specific inquiry or receive any false information about existing noise regulations. *Id.* at 181. In other words, the county gave no express assurance that the operator could justifiably rely on. *Id.*

¶18 The reasoning in *Meaney* is well founded in light of the context. The only way a plaintiff can detrimentally rely on government assurances regarding building code requirements is for the statement to be false or incorrect. The inaccuracy requirement is inherent to that scenario—if the assurances were true, there would be no conflict. While a number of other cases have referenced *Meaney*'s "incorrect information" language in connection with the special relationship exception, in each of those cases the government was providing only information to the plaintiffs, and not promising action. *See, e.g., Taylor,* 111 Wn.2d at 166 (alleged negligence in issuing building permit); *Vergeson v. Kitsap County,* 145 Wn. App. 526, 539, 186 P.3d 1140 (2008) (no incorrect information provided by county regarding the status of court-quashed warrants from its database); *Smith v. State,* 135 Wn. App. 259, 282, 144 P.3d 331 (2006) (alleged

negligence in providing information about appeal rights regarding adoption assistance benefits).

¶19 However, we have drawn a clear distinction between assurances involving *information* and assurances promising *action*. *Beal*, 134 Wn.2d at 786. In *Beal*, a wrongful death action was brought against the city based on a delayed response to a 911 caller who was later murdered by her estranged husband. *Id.* at 773-74. The caller in that case called from a neighboring apartment, stating her recently abusive husband was next door, possibly with a gun, and would not let her get her property out of the apartment. *Id.* at 773. We held the following exchange was sufficient to constitute an express assurance:

> "911: Okay. Well I'll tell you what, we're going to send somebody there. Are you going to wait in number 4 [another apartment] until we get there?
>
> "CALLER: I'll be waiting outside in the front with my mom.
>
> "911: Okay. We'll get the police over there for you okay?
>
> "CALLER: Alright [sic], thanks."

*Id.* at 785 (alterations in original). About 20 minutes later, the husband approached the vehicle where she was waiting and shot and killed her. *Id.* at 774. No police officer had been dispatched at the time of the shooting. *Id.*

¶20 The city in that case relied on *Meaney* for the proposition that the information provided must have been inaccurate at the time given and argued that an assurance of future acts with no time requirements is not inaccurate or false. *Id.* at 786. We squarely rejected that argument, explaining:

> This reading of *Meaney* is too narrow, because a definite *assurance of future acts* could be given without a specific time frame, with the government then *failing to carry out those acts*. *Meaney* specifically involved information about building permit requirements, which either is or is not accurate at the time

given. The same cannot be said about assurances that future acts will occur.

*Id.* (emphasis added).

¶21 The *Beal* opinion recognized the important distinction between building code cases and 911 cases. In 911 cases, the plaintiff relies not only on the information contained in the assurance, but also on the fulfillment of the action promised in the assurance. The implication from *Beal* is that it is possible for a 911 caller to detrimentally rely on a statement that is technically true but negligently fulfilled. That principle contradicts the notion that surface level accuracy cannot constitute an express assurance.

¶22 The County also relies on *Harvey v. Snohomish County* for its argument that falsity is required. 157 Wn.2d 33, 134 P.3d 216 (2006). Yet an examination of that case does not mandate the County's interpretation. In *Harvey*, an assault victim claimed the county (including the 911 emergency communications center) negligently failed to rescue him, his son, and his neighbor from a deranged home intruder within eight minutes after placing a call to 911. *Id.* at 35. We said there were no express assurances the caller could rely on because the 911 operator was merely updating the caller on developments in the situation. *Id.* at 38. The operator remained on the phone with the caller at the same time that she informed a police dispatcher of the situation. *Id.* at 35-36. In response to the caller asking where he should go, the operator told him to do whatever he felt was most safe to do. *Id.* at 36. While the factual scenario is similar to Munich's, the legal context is different. The sole basis for the detrimental reliance claim in *Harvey* was that the caller stayed on the phone with the 911 operator in response to the operator's request to do so. *Id.* at 40. In contrast to Munich's case, the plaintiffs in *Harvey* did not allege the 911 operator acted negligently in fulfilling any promise of action.

¶23 *Harvey* did not interpose any new requirement that assurances be false or inaccurate. However, some language

in the opinion comments on the accuracy of the particular statements that were at issue. For example, we concluded there was no special relationship because the victim could not show "any alleged assurance made by the operator was false, unfulfilled, relied upon, or made to his detriment." *Id.* at 38; *see also id.* at 39 (the caller "never received any assurance from the operator that was untruthful or inaccurate"). But the veracity of assurances was relevant in that context because it demonstrated there was no breach, *even if* a duty was created, "[E]ven if we assume the statements . . . created a duty, there is no showing the 911 operator ever breached that duty or that [the caller] relied on those statements to his detriment." *Id.* at 40. Indeed, our use of the disjunctive conjunction "or" suggests that a special relationship could have been established had the operator's statements been technically truthful, yet ultimately "unfulfilled." *Id.* at 38. We do not read *Harvey* to stand for the proposition that falsity is a requirement to establish a duty in the first place.

¶24 The County's argument ignores the fact that negligence can take forms other than the mere transmittal of incorrect factual information. In cases like this, where the express assurance involves a promise of action (i.e., "I'll send an officer to your location" or "a deputy is en route"), truth or falsity is not determinative because the government actor may be negligent in following through on the assurance. The Estate offers a hypothetical that correctly illustrates the County's flawed reasoning:

> Under [the County's] position, if someone calls 911 for a medical emergency and is told an ambulance is on the way, and the person waits at home for the ambulance rather than calling a cab or a friend to take them to the hospital, but the ambulance personnel stop for coffee on the way and the person dies, there would be no cause of action because an ambulance had been dispatched and was "on the way" and would eventually arrive.

Resp't's Suppl. Br. at 18. Arguing the County would have no duty in that scenario because it "truthfully" assured the

caller help was "on the way" rings hollow. It is readily apparent that promised *action* requires more than superficially accurate *words*.

¶25 We hold that here, where the alleged express assurance involves a promise of action, the plaintiff is not required to show the assurance was false or inaccurate in order to satisfy the special relationship exception. In a 911 case like this, the express assurance element is satisfied when the operator assures the caller law enforcement officers are on their way or will be sent to the caller's location. *See, e.g., Beal*, 134 Wn.2d at 785 (finding express assurance made when 911 operator stated, " '[W]e're going to send somebody there' " and " 'We'll get the police over there for you' " (quoting Clerk's Papers at 119)); *Chambers-Castanes v. King County*, 100 Wn.2d 275, 279-80, 669 P.2d 451 (1983) (express assurance where operator said, " 'We have the officers on their way out there right now' "); *Bratton v. Welp*, 145 Wn.2d 572, 576-77, 39 P.3d 959 (2002) (express assurances where operator told caller if she or her family was threatened again that the police would be sent). Whether or not the assurances were ultimately truthful or accurate may be relevant, but only in relation to the issue of a breach, not to the establishment of a duty.

¶26 The County speculates that holding 911 centers accountable for the failure to fulfill its assurances will undermine their effectiveness for fear of liability. 911 centers provide vital services to the community, and we do not take lightly issues implicating their potential liability. But the County's speculation is misguided. As evidenced in *Harvey*, 911 centers can still engage in truthful communication with callers without incurring legal liability if they keep callers informed with timely and accurate information while correctly dispatching law enforcement. Our holding does not increase municipalities' exposure to liability in this context. It simply recognizes what has always been the case—a special relationship is established by privity, an express assurance, and justifiable reliance. It is noteworthy that in every case discussing the special relationship excep-

tion, the same three elements are repeatedly cited and employed, even in cases where truth or falsity is tangentially discussed. *See, e.g.*, *Harvey*, 157 Wn.2d at 38-41 (special relationship requires privity, express assurance, and reliance); *Meaney*, 111 Wn.2d at 178-79 (explicitly numbering the same three elements).

¶27 We emphasize that a special relationship does not automatically result in liability. Plaintiffs seeking to recover must still establish breach, proximate cause, and damages, just as if they were suing a private defendant. If the government acted reasonably under the circumstances, no liability will incur. *See Beal*, 134 Wn.2d at 787 n.5 ("Of course, the trier of fact may ultimately conclude that the City acted reasonably in the circumstances . . . and therefore did not breach any duty owed."). The Estate has alleged facts sufficient to withstand the County's motion for summary judgment on the issue of whether a duty existed as a matter of law. Whether or not the Estate can prove the County acted negligently in this case remains to be seen.

## IV. CONCLUSION

¶28 Express assurances promising action need not be false or inaccurate in order to satisfy the special relationship exception to the public duty doctrine. 911 callers rely not only on accurate information, but also on the reasonable fulfillment of assurances. The trial court and Court of Appeals properly held the same. We affirm.

MADSEN, C.J., and C. JOHNSON, CHAMBERS, OWENS, STEPHENS, WIGGINS, and GONZÁLEZ, JJ., concur.

¶29 CHAMBERS, J. (concurring) — I concur with, and have signed, the majority opinion. It properly describes and applies our 911 jurisprudence. I write separately because based upon the briefing we have received and the Court of Appeals opinions I have reviewed, I believe there is great

confusion about what our public duty doctrine jurisprudence means. We (and I include myself) have not been careful in what we have said in past cases. This has given rise to deeply held and greatly divergent views on the doctrine. Some think the public duty doctrine is a tort of its own imposing a duty on any government that gives assurances to someone. Some view it as providing some sort of broad limit on all governmental duties so that governments are never liable unless one of the four exceptions to the public duty applies, thus largely eliminating duties based on the foreseeability of avoidable harm to a victim. In fact, the public duty doctrine is simply a tool we use to ensure that governments are not saddled with greater liability than private actors as they conduct the people's business.

¶30 Although we could have been clearer in our analyses, the only governmental duties we have limited by application of the public duty doctrine are duties imposed by a statute, ordinance, or regulation.[3] This court has never held that a government did not have a common law duty

---

[3] A review of our case law makes this clear. See generally Harvey v. Snohomish County, 157 Wn.2d 33, 134 P.3d 216 (2006); Osborn v. Mason County, 157 Wn.2d 18, 134 P.3d 197 (2006); Cummins v. Lewis County, 156 Wn.2d 844, 133 P.3d 458 (2006); Aba Sheikh v. Choe, 156 Wn.2d 441, 128 P.3d 574 (2006); 1515-1519 Lakeview Boulevard Condo. Ass'n v. Apartment Sales Corp., 146 Wn.2d 194, 43 P.3d 1233 (2002); Howe v. Douglas County, 146 Wn.2d 183, 43 P.3d 1240 (2002); Bratton v. Welp, 145 Wn.2d 572, 39 P.3d 959 (2002); Babcock v. Mason County Fire Dist. No. 6, 144 Wn.2d 774, 30 P.3d 1261 (2001); Hertog v. City of Seattle, 138 Wn.2d 265, 979 P.2d 400 (1999); Bishop v. Miche, 137 Wn.2d 518, 973 P.2d 465 (1999); Ravenscroft v. Wash. Water Power Co., 136 Wn.2d 911, 969 P.2d 75 (1998); Beal v. City of Seattle, 134 Wn.2d 769, 954 P.2d 237 (1998); Taggart v. State, 118 Wn.2d 195, 822 P.2d 243 (1992); Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wn.2d 506, 799 P.2d 250 (1990); Oberg v. Dep't of Natural Res., 114 Wn.2d 278, 787 P.2d 918 (1990); Honcoop v. State, 111 Wn.2d 182, 759 P.2d 1188 (1988); Meaney v. Dodd, 111 Wn.2d 174, 759 P.2d 455 (1988); Taylor v. Stevens County, 111 Wn.2d 159, 759 P.2d 447 (1988); Hoffer v. State, 110 Wn.2d 415, 755 P.2d 781 (1988); Bailey v. Town of Forks, 108 Wn.2d 262, 737 P.2d 1257, 753 P.3d 523 (1987); Hartley v. State, 103 Wn.2d 768, 698 P.2d 77 (1985); J&B Dev. Co. v. King County, 100 Wn.2d 299, 669 P.2d 468 (1983), overruled on other grounds by Meaney, 111 Wn.2d 174; Chambers-Castanes v. King County, 100 Wn.2d 275, 669 P.2d 451 (1983); Baerlein v. State, 92 Wn.2d 229, 595 P.2d 930 (1979); Halvorson v. Dahl, 89 Wn.2d 673, 574 P.2d 1190 (1978); Mason v. Bitton, 85 Wn.2d 321, 534 P.2d 1360 (1975); Campbell v. City of Bellevue, 85 Wn.2d 1, 530 P.2d 234 (1975); King v. City of Seattle, 84 Wn.2d 239, 525 P.2d 228 (1974); Evangelical United Brethren Church v. State, 67 Wn.2d 246, 407 P.2d 440 (1965).

solely because of the public duty doctrine. This concurrence will attempt to explain why that is so.

¶31 There was a time when the king could do no wrong and the sovereign was immune from suit. *Alden v. Maine*, 527 U.S. 706, 768 n.6, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999) (Souter, J., dissenting); *see also Kelso v. City of Tacoma*, 63 Wn.2d 913, 914-15, 390 P.2d 2 (1964). Over time, this principle became increasingly unpopular among courts, certain legislators, and legal scholars, who believed government should be more accountable for its conduct. *Kelso*, 63 Wn.2d at 915-16. In 1961, the Washington Legislature repealed the State's immunity for governmental functions. LAWS OF 1961, ch. 136, § 1 (codified as RCW 4.92.090). And in 1967, the legislature expressly repealed immunity for local governments. LAWS OF 1967, ch. 164, § 1 (codified as RCW 4.96.010). Amended only once since, in Laws of 1963, chapter 159, section 2, the repeal of state immunity presently reads as follows: "The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation." RCW 4.92.090.

¶32 But treating governments the same as private persons or corporations became problematic where statutes and ordinances imposed duties on governments not imposed upon private persons or corporations. *See Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 253, 407 P.2d 440 (1965) ("Essentially, then, the official conduct giving rise to liability must be *tortious*, and it must be analogous, in some degree at least, to the chargeable misconduct and liability of a private person or corporation."). Private persons do not govern, pass laws, or hold elections. Private persons are not required by statute or ordinance to issue permits, inspect buildings, or maintain the peace and dignity of the state of Washington. We therefore found the "traditional rule" helpful when a duty was imposed or mandated upon a government entity by

statute or ordinance. *Halvorson v. Dahl*, 89 Wn.2d 673, 676, 574 P.2d 1190 (1978).

¶33 According to the traditional rule, "municipal ordinances impose a duty upon municipal officials which is owed to the *public* as a *whole*, so that a duty enforceable in tort is not owed to any particular *individual*." *Id.* This traditional rule became known as the "public duty doctrine." *J&B Dev. Co. v. King County*, 100 Wn.2d 299, 303-04, 669 P.2d 468 (1983), *overruled on other grounds by Meaney v. Dodd*, 111 Wn.2d 174, 759 P.2d 455 (1988). Because we were interpreting legislation, our goal was to determine legislative intent. *See, e.g., Halvorson*, 89 Wn.2d at 676. We used the public duty doctrine as a tool to analyze whether a mandated government duty was owed to the public in general or to a particular class of individuals. *See id.*

¶34 Because the legislature had declared that governments were to be liable for their tortious conduct just like private persons or corporations, the public duty doctrine was not applied to duties that governments had in common with private persons. Thus, for example, the public duty doctrine applies to a city's building department's actions when issuing building permits because that is a function imposed by ordinance and not a duty shared with private persons. *Meaney*, 111 Wn.2d at 178-79. But the same building department owes common law, premises-liability duties to those who enter the building department's offices because all possessors of land owe the same duties to those who enter, whether the landowners are public or private entities. *See generally Oberg v. Dep't of Natural Res.*, 114 Wn.2d 278, 787 P.2d 918 (1990) (holding public duty doctrine did not apply where state agency had independent common law and statutory duties that applied to all landowners). The following excerpts from our cases illustrate that the public duty doctrine is properly applied to duties mandated by statute or ordinance as opposed to common law duties:

The traditional rule is that municipal ordinances impose a duty upon municipal officials which is owed to the *public* as a *whole*, so that a duty enforceable in tort is not owed to any particular *individual* . . . .

The traditional rule has an exception, however, which is applicable in this case. Liability can be founded upon a municipal code if that code by its terms evidences a clear intent to identify and protect a particular and circumscribed class of persons.

*Halvorson*, 89 Wn.2d at 676 (Utter, J., writing for a unanimous court) (citations omitted).

By our language in *Halvorson*, we advised legislative bodies that, when they impose a duty on public officials as a whole, no duty in tort is owed to a particular individual. If, on the other hand, the legislation evidences a clear intent to identify a particular and circumscribed class of persons, such persons may bring an action in tort for violation of the statute or ordinance. Thus, the first question we must determine in this case is if such a clear legislative intent exists.

*Baerlein v. State*, 92 Wn.2d 229, 232, 595 P.2d 930 (1979) (Dolliver, J., writing for a unanimous court).

In *Chambers-Castanes*, we acknowledged that the law may impose "a duty to perform a mandated act for the benefit of particular persons or class of persons."

*Hartley v. State*, 103 Wn.2d 768, 782, 698 P.2d 77 (1985) (Dolliver, C.J., writing for a unanimous court) (quoting *Chambers-Castanes v. King County*, 100 Wn.2d 275, 285, 669 P.2d 451 (1983)).

Traditionally state and municipal laws impose duties owed to the public as a whole and not to particular individuals. . . . Thus " 'for one to recover from a municipal corporation in tort it must be shown that the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (*i.e.*, a duty to all is a duty to no one).' "

*Meaney*, 111 Wn.2d at 178 (citations omitted) (Callow, J., writing for a unanimous court) (quoting *Bailey v. Town of Forks*, 108 Wn.2d 262, 265, 737 P.2d 1257, 753 P.2d 523 (1987) (quoting *J&B*, 100 Wn.2d at 303)).

> The public duty doctrine provides that regulatory statutes impose a duty on public officials which is owed to the public as a whole, and that such a statute does not impose any actionable duty that is owed to a particular individual.

*Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988) (Dore, J., writing for the court) (citing *Bailey*, 108 Wn.2d at 265-66; *Chambers-Castanes*, 100 Wn.2d at 284).

> Liability may exist, however, where a relationship exists or has developed between the plaintiff and the municipality's agents giving rise to a duty to perform a *mandated act* for the benefit of a particular person or class of persons.

*Beal v. City of Seattle*, 134 Wn.2d 769, 784-85, 954 P.2d 237 (1998) (Madsen, J., writing for the majority) (emphasis added) (citing *Chambers-Castanes*, 100 Wn.2d at 285).

> Additionally, under the public duty doctrine, the State is not liable for its negligent conduct *even where a duty does exist* unless the duty was owed to the injured person and not merely the public in general.

*Aba Sheikh v. Choe*, 156 Wn.2d 441, 448, 128 P.3d 574 (2006) (Owens, J., writing for the majority) (emphasis added) (citing *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988)).

¶35 Perhaps the best example of all is *Hoffer v. State*, 110 Wn.2d 415, 755 P.2d 781 (1988), written by Justice Durham. In this Washington Public Power Supply System bond case, the court considered six claims under different headings: statutory duties; fraudulent misrepresentation; negligent misrepresentation; The Securities Act of Washington, chapter 21.20 RCW; interference with a business relationship; and unjust enrichment. The court was not precise in its description of the public duty doctrine, saying, "We first

address the public duty doctrine. Under that doctrine, the State cannot be held liable for tortious acts of its officials if that liability is based on a duty owed to the public generally." *Id.* at 421-22 (citing *J&B*, 100 Wn.2d at 303). But the court then discussed the public duty doctrine only in connection with the statutory claim and not the common law claims; it obviously limited application of the public duty doctrine to those duties imposed by statute or ordinance.

¶36 I will concede that several of our cases have appeared to analyze both statutory duties and common law duties under the public duty analytical framework. But usually we have done so only to say a special relationship existed and both statutory and common law claims survived. *See Taggart v. State*, 118 Wn.2d 195, 217-19, 822 P.2d 243 (1992); *Bishop v. Miche*, 137 Wn.2d 518, 530, 973 P.2d 465 (1999) (both cases disposed of the public duty doctrine defense on claims of negligent supervision of probationers based upon duties established in *Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983)); *see also Aba Sheikh*, 156 Wn.2d at 454 (treated both public duty doctrine and common law claims under traditional public policy approach). We have also often used broad language describing the public duty doctrine. However, our research reveals no cases where a common law duty was limited solely because of a public duty analysis.

¶37 The distinction between mandated duties and common law duties is important because duties imposed by common law are owed to all those foreseeably harmed by the breach of the duty. *See Christen v. Lee*, 113 Wn.2d 479, 491-92, 780 P.2d 1307 (1989). In contrast, under the public duty doctrine analysis, unless there is a duty to enforce legislation, the duty is generally owned only to those with whom the government has a special relationship. This distinction is illustrated in *Oberg*, 114 Wn.2d 278.

¶38 A fire broke out on Department of Natural Resources (DNR) land, and DNR failed to contain it. It spread,

damaging several neighbors' properties. DNR admitted that " '[p]rivate landowners in Washington have a common law duty to exercise reasonable care in preventing fire from spreading to lands of neighboring owners.' " *Id.* at 281 (quoting DNR's brief). DNR also conceded that, as a property owner, it had a duty to take reasonable steps to contain a fire on its property and that duty extended to neighbors foreseeably harmed. But DNR argued its common law duty was " 'subsumed' " into its statutory duty to prevent and suppress forest fires. *Id.* at 287, 289 (quoting DNR's brief). According to DNR's argument, because its common law duty was subsumed into its statutory duty to provide fire protection to the public, under the public duty doctrine, it had no duty to its neighbors.[4] Had DNR been successful in its argument, it would have had a duty to its neighbors only if a special relationship had been created. This court rejected the argument. *Id.* at 289.

¶39 As *Oberg* makes clear, limiting the government's common law duties to only those with whom the government has a special relationship, while extending the liability of private individuals to all those foreseeably harmed by a breach of the same common law duties, would violate the clear declaration of the legislature that governments are to be liable "to the same extent" as private persons or corporations. RCW 4.92.090; RCW 4.96.010(1). We also expressed this concern in *Bailey*, 108 Wn.2d at 267 (noting "the difficult question as to whether affording special protection to agents of the government violates the Legislature's directive, which requires governmental bodies to be liable in tort").

---

[4] In fact, DNR's duty to prevent the spread of fire as a landowner was based on both common law and statutory duties. *See Oberg*, 114 Wn.2d at 282-83. However, its statutory duty as a landowner was not a government duty mandated by statute or ordinance but was, like a common law duty, imposed on all landowners in Washington whether public or private. *Id.* The court held that the mandated government duty of fighting fires did not subsume and eliminate the landowner duties created by both statute and common law. *Id.* at 289.

¶40 The case before us is a 911 emergency operator case. It relies upon *Chambers-Castanes,* 100 Wn.2d 275, and its progeny. In *Chambers-Castanes,* several witnesses called the police to report a couple had been run off the road and were being threatened. Multiple callers were repeatedly assured by a 911 operator an officer was on the way. After a half hour Mrs. Chambers-Castanes herself called to report that her husband had been assaulted. When told no one was on the way she got upset with the operator. The operator told her, " 'You'd better calm down or I won't send anybody.' " *Id.* at 279. By the time officers arrived the assault was long over and the assailants had fled.

¶41 The plaintiffs' theory was founded on both statutory and common law duties. *Id.* at 284. Although the plaintiffs argued in terms of a "special relationship" it is clear from their briefing that rescue doctrine cases played a large role in the development of their argument. Br. of Appellants at 18, *Chambers-Castanes v. King County,* No. 47968-2 (Wash. Nov. 25, 1981), *reprinted in* 4 Briefs 100 Wn.2d (1983) ("The [rescue doctrine] case is particularly apposite to the instant case as both cases involve assurances by police . . . negligent handling of the calls . . . detrimental reliance and resulting harm."). The trial court had held King County had no duty to the plaintiff under the public duty doctrine. *Chambers-Castanes,* 100 Wn.2d at 284. The statute analyzed by the court in *Chambers-Castanes* was RCW 36.28.010, which requires that the sheriff and deputies " '[s]hall keep and preserve the peace' " and " 'arrest . . . all persons who break the peace, or attempt to break it.' " *Id.* (alterations in original) (quoting RCW 36.28.010(1), (6)). This court concluded there was nothing in the statute that indicated intent to protect a particular class of individuals. *Id.* at 284-85.

¶42 The court then turned to the special relationship exception, citing the seminal case *Campbell v. City of Bellevue,* 85 Wn.2d 1, 530 P.2d 234 (1975). *Chambers-Castanes,* 100 Wn.2d at 285. While the *Chambers-Castanes* court did not adopt the rescue doctrine approach, the court

did incorporate the assurances by the county and reliance by the plaintiff argued by the plaintiffs in their briefing to support the creation of a special relationship. *Id.* at 286. All subsequent 911 cases have assumed there is a mandated duty under RCW 36.28.010 to preserve the peace and arrest those who disturb it and have held a special relationship is created by the assurances of a 911 operator upon which the plaintiff reasonably relies. *E.g.*, *Beal*, 134 Wn.2d at 784-85; *Bratton v. Welp*, 145 Wn.2d 572, 576-77, 39 P.3d 959 (2002). These cases were correctly decided as an exception to the public duty doctrine. These cases are also analogous to the common law rescue doctrine in the sense the rescue begins when the operator represents help is on the way and the plaintiff relies upon that representation to his detriment. *See Osborn v. Mason County*, 157 Wn.2d 18, 25, 134 P.3d 197 (2006) (rescue doctrine imposes a duty "because a public entity's assurances may induce reliance"). Because the special relationships in these 911 cases are in the nature of rescue doctrine cases, assurances and reliance are appropriate measures of whether a duty arose.

¶43 I agree with the majority and the Court of Appeals that where a 911 operator gives assurances, the accuracy or falsity of the information is irrelevant. It is the assurance upon which the operator may assume the assured will reasonably rely that creates a duty. A party may breach that duty by negligently performing that which was assured.

¶44 It is ultimately and uniquely the responsibility of this court to determine when duties arise. While I would clarify that the public duty doctrine applies to governmental duties mandated by legislative bodies and not common law duties owed by every private and public entity alike, I would not change any of our precedents. I would not reexamine any case where we have held the government does or does not owe a duty.

¶45 Our goal should be to fulfill the legislature's intent to make governments accountable to the same degree as private individuals and corporations, but also to ensure that governments have no greater liability than others. We

must recognize that some governmental functions are not meaningfully analogous to anything a private person or corporation might do. *Evangelical*, 67 Wn.2d at 252-53. We have a rich tradition and body of jurisprudence to guide us in settling new claims regarding the duties of governments.

¶46 With these observations, I join the majority.

C. JOHNSON, STEPHENS, WIGGINS, and GONZÁLEZ, JJ., concur with CHAMBERS, J.

¶47 J.M. JOHNSON, J. (dissenting) — The requirement of a false, inaccurate, or unfulfilled assurance has always been part of the special relationship exception to the public duty doctrine. This is because falsity is *inherent* in the prerequisite that an individual detrimentally rely on the government's assurance before a duty toward that individual is recognized. It is impossible to detrimentally rely on a true and accurate statement of fact: central to detrimental reliance is the notion that a false or misleading representation causes the individual to act differently than he or she would act with accurate information. The majority ignores this by reading into the Skagit 911 operator's true factual statements an *implied* promise regarding the length of time it would take for an officer to arrive on site. Yet, our precedent states that only "express assurances" sought out by the plaintiff may give rise to a special relationship. I am concerned the majority's decision will put unwarranted pressure on every statement made by 911 operators, straining communications that depend on the free flow of information. I dissent.

¶48 Pursuant to the public duty doctrine, in order to recover from a governmental entity in tort, a plaintiff must establish the existence of a duty owed to him or her as an individual, rather than a general obligation to the public at large. *Taylor v. Stevens County*, 111 Wn.2d 159, 759 P.2d 447 (1988). The doctrine exists to protect governmental entities

that provide services to the general public from opening themselves up to unlimited liability. *Id.* at 170 ("The policy underlying the public duty doctrine is that legislative enactments for the public welfare should not be discouraged by subjecting a governmental entity to unlimited liability.").

¶49 An exception to the public duty doctrine arises if a "special relationship" is established between a government agent and a specific individual. A duty is established through a special relationship if (1) there is direct contact or privity between the public official and the injured plaintiff that sets the latter apart from the general public, (2) there are express assurances given by the public official, and (3) the plaintiff justifiably relies on those express assurances to his or her detriment. *Beal v. City of Seattle*, 134 Wn.2d 769, 785, 954 P.2d 237 (1998). The existence of a duty is a question of law. *Taylor*, 111 Wn.2d at 159.

¶50 This case asks whether, in order to establish the special relationship exception to the public duty doctrine, the assurances given by the government actor must be false, inaccurate, or unfulfilled. The Court of Appeals refused to recognize falsity as an "additional element" necessary to find a special relationship (and duty). *Munich v. Skagit Emergency Commc'ns Ctr.*, 161 Wn. App. 116, 125, 250 P.3d 491 (2011). The majority affirms this reasoning. Though the provision of inaccurate information is not an "additional element" necessary to form a special relationship, it *is inherent in the special relationship and duty formulation.* For the third element—detrimental reliance—to be established, the government's express assurance must be false or fail. *See Harvey v. Snohomish County*, 157 Wn.2d 33, 41-42, 134 P.3d 216 (2006) (holding there was no duty owed where the plaintiff "never received any assurance from the operator that was untruthful or inaccurate" and did not "show[ ] that he relied on any assurance to his detriment").

¶51 At the heart of detrimental reliance is the notion that incorrect or misleading information caused the recipi-

ent (here the caller of 911) to act to his or her disadvantage. *See* BLACK's LAW DICTIONARY 1404 (9th ed. 2009) (defining *"detrimental reliance"* as "[r]eliance by one party on the acts or representations of another, causing a worsening of the first party's position"). The detriment arises when one relies on faulty information and therefore makes choices that are different from those the person would have made with accurate information. If truthful information is given, detrimental reliance cannot be established. Most information is known directly to the 911 caller.

¶52 The estate of William R. Munich claims that Skagit 911 should be held liable because an officer could have arrived to assist Munich faster had Munich's initial call been coded as a level one emergency. But, the Skagit 911 operator made no express assurances regarding how the call was prioritized, nor did she approximate an arrival time.

¶53 The operator made the following true statements: that an officer had been dispatched and was traveling toward Munich. A special duty does not attach merely because the operator correctly states that help has been dispatched and is on the way. A caller who receives this information stands in the same position as every 911 caller who requests and receives assistance. Plaintiffs would charge defendants with misfeasance that arose out of a general duty to the public to respond to emergency situations, not from any "special relationship."

¶54 This court has consistently held, in order for a duty to arise, the individual must be given express assurance from the government and inaccurate information must be provided that the individual relies on to his or her detriment. In *Meaney v. Dodd*, we stated:

> It is only where a direct inquiry is made by an individual and *incorrect* information is clearly set forth by the government, the government intends that it be relied upon and it is relied upon by the individual to their detriment, that the government may be bound.

111 Wn.2d 174, 180, 759 P.2d 455 (1988) (emphasis added). Here, Munich sought no assurance relating to the time of the officer's arrival, and the operator made no such assurance. *See Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 789, 30 P.3d 1261 (2001) (In order for a duty to arise, "[t]he plaintiff must seek an express assurance and the government must unequivocally give that assurance."). Still, the majority finds an unfulfilled assurance hidden somewhere in the operator's truthful words.

¶55 The bulk of the majority's reasoning rests on language from *Beal* regarding the difference between the provision of information and the promise of future action. Majority at 881. Assuming such a distinction can sometimes be drawn, it is not relevant to this case. Just because this case—like *Beal*—involved a 911 call, does not mean every piece of information from the call center operator automatically transforms into an "assurance of future action." The operator in *Beal* made clear assurances of future action (" 'we're going to send somebody there' " and " '[w]e'll get the police over there for you okay?' "), which the government subsequently failed to carry out. 134 Wn.2d at 785-86. No police officer was ever dispatched. *Id.* at 774. Similarly, in every other case in which a duty arose based on a 911 operator's statements, "the operators told the callers police were dispatched *when they had not been*." *Harvey*, 157 Wn.2d at 39 (emphasis added).

¶56 In contrast, the Skagit 911 operator provided Munich with correct information regarding what had occurred: a police officer had been dispatched and was heading in Munich's direction. We found no duty in *Harvey* when the operator made statements similar to those given to Munich:

> Harvey never received any assurance from the operator that was untruthful or inaccurate. . . . In other words, when the operator told Harvey she had notified police of the situation, she had. When the operator told Harvey the police were in the area and officers were setting up, they were.

*Id.* (footnote omitted). Nevertheless, the majority reads into the operator's statements an implied promise that the officer would arrive as quickly as humanly possible. This runs afoul of our prior declaration that "[a] government duty cannot arise from implied assurances." *Babcock*, 144 Wn.2d at 789.

¶57 The consequences that may flow from the majority's reasoning are especially worrisome. Based on this decision, 911 operators will be unlikely to answer typical questions like "are you sending someone?" without fear of giving rise to a special relationship. In fact, the only information an operator may divulge without creating a special relationship is that the call was received. Public confidence in emergency services will surely diminish and the service become less valuable if callers in potentially life-threatening situations are unable to receive assurances that help is on the way. Callers are often frightened and flustered by the event they are reporting, and operators may need to convey calming and reassuring information to the caller to obtain necessary information. This dynamic will be seriously altered if operators must fear that their reassurances, even though true, may be used to impose liability on emergency service providers. The effectiveness of emergency service response may also be threatened if providers are worried about their decisions being second-guessed in hindsight.

¶58 As a matter of law, the estate has failed to establish detrimental reliance—the third element of the special relationship exception to the public duty doctrine.[5] Detrimental reliance cannot be established where a government actor

---

[5] The majority states the question of detrimental reliance is "a question of fact generally not amenable to summary judgment." Majority at 879. However, in *Harvey*, we "disagree[d]" with the Court of Appeals' holding "that it was a question of fact for a jury to decide whether [the 911 operator's statements] were relied upon to the detriment of Harvey." *Harvey*, 157 Wn.2d at 40 n.4. Detrimental reliance is only one element required to establish the existence of a duty. The overarching question of whether a duty exists is one of law. *Taylor*, 111 Wn.2d at 171.

merely provides true and accurate statements of fact. Nor can implied promises read into truthful statements give rise to a governmental duty. I respectfully dissent.