# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

TRICIA KEITH BARTLETT, as the
Personal Representative of the
ESTATE OF AMBER MARY KEITH;
TRICIA KEITH BARTLETT, an
individual; DEAN BARTLETT, an
individual; and, JESSE KEITH, an
individual,

          Appellants,

          v.

VALLEY COMMUNICATIONS
CENTER, a governmental
administration agency,

          Respondent.

No. 87600-7-I

DIVISION ONE

PUBLISHED OPINION

MANN, J. — Tricia Keith Bartlett, individually and as the personal representative of Amber Keith's estate, Dean Bartlett, and Jesse Keith (collectively, the Estate) sued Valley Communications Center (VCC) alleging that VCC employees negligently classified the 911 calls from the Ramada Inn, which reported sounds of murder and a violent struggle as a lower priority, placing the call into a "hold" status and resulting in a delayed emergency response and Keith's death. The Estate asserted a negligence claim and a negligent supervision and training claim. The trial court dismissed the complaint under CR 12(b)(6), and the Estate appeals.

Because the allegations in the complaint are legally sufficient to establish that the special relationship exception to the public duty doctrine applied, the trial court erred in dismissing the Estate's negligence claim. But because the Estate did not allege that any VCC employee was acting outside their scope of employment, the Estate's negligent supervision and training claim fails.

Accordingly, we reverse the trial court's dismissal of the Estate's negligence claim and affirm the trial court's dismissal of the negligent supervision and training claim.

I

On June 14, 2021, Keith was the sole registered occupant in room 214 at the Ramada Inn in Kent, Washington. At around 10:30 a.m., the hotel's housekeeper Rosa Yolanda Diaz Pacheco was cleaning room 212 when she heard sounds of a violent struggle from room 214. Other occupants on the floor also heard disturbing and violent sounds coming from room 214.

Pacheco ran to the front desk to alert security officer Phillip Eugene Roush. Roush's job was to provide security services for the employees and guests at the Ramada Inn. The area had been plagued with violence and crime.

Roush arrived at room 214 and heard screaming and things breaking. Roush heard a female in the room screaming "stop choking me," "stop pushing me," and "leave me alone."

After a few minutes, at 10:56 a.m., Roush called the Kent police nonemergency phone number. This connected him with an employee of VCC (VCC Employee 1). Roush told VCC Employee 1 that it sounded like someone was getting murdered in

-2-

room 214, and he provided the address. Roush said it was violent, like a 911 situation, and said, "ASAP. ASAP. Cause somebody's getting murdered over here." Roush stated that he did not know who was in the room, but there had been a "bunch of transients" coming into the hotel.

VCC Employee 1 said that they were dispatching help and that they would get there as quickly as they can. VCC Employee 1 entered into CAD that Roush reported sounds of domestic violence, assigned it a priority level 2, and noted that Roush thinks transients are in the room and that there were no weapons. Unknown to Roush, the call was placed into a "hold" status.

At 11:16 a.m., Roush called the nonemergency line once again, but it never connected, so he hung up. At 11:26 a.m., Roush heard more concerning noises and called the nonemergency line for a third time.

The third call was answered by another employee (VCC Employee 2). Roush referred to the incident as domestic violence and said he heard heavy breathing and that it was very bad and that he never heard anything like it. VCC Employee 2 said she would let them know that he called back about the time delay and provide an update.

A VCC employee then contacted the Kent police over radio requesting that they look into the holding calls to see if they could provide an anticipated reporting time. This employee told the officer that Roush reported domestic violence among transients in the room. The officer asked if the room was vacant, and the employee said it sounds like it. Meanwhile, Roush heard shallow breathing and then silence.

At 11:43 a.m., Philip Lopez placed a call to 911 and was connected to VCC. Lopez was the one in the room with Keith. Lopez stated that he needed an ambulance

because his fiancé overdosed on drugs and was not breathing. VCC placed this call into CAD as priority 1.

Within minutes, emergency personnel and officers arrived on the scene and began life saving measures. Keith was pronounced dead. Lopez was arrested and charged with the assault and murder of Keith.

The Estate filed a wrongful death suit against VCC. Before filing an answer, VCC successfully moved for dismissal under CR 12(b)(6) arguing that the Estate could not show that VCC owed a duty to Keith.

The Estate appeals.

II

A

We review a trial court's dismissal order under CR 12(b)(6) de novo. Tavaglione v. Dehkhoda & Qadri, P.C., 34 Wn. App. 2d 515, 519, 568 P.3d 1158 (2025). Dismissal is appropriate only if no set of facts consistent with the complaint would entitle the plaintiff to relief. Tavaglione, 34 Wn. App. 2d at 520. We presume true all the facts in the complaint and will reject dismissal if there is any hypothetical situation conceivably raised by the complaint that is legally sufficient to support the claim. Tavaglione, 34 Wn. App. 2d at 520. For the purposes of CR 12(b)(6), we may consider hypothetical facts outside the record. Tulalip Tribes of Wash. v. Lexington Ins. Co., 34 Wn. App. 2d 108, 113, 566 P.3d 149 (2025). Motions to dismiss brought under CR 12(b)(6) should be granted only sparingly. Tulalip, 34 Wn. App. 2d at 113.

To be held liable in accordance with Washington's sovereign immunity statutes, a government entity must engage in tortious conduct that is analogous in some degree to

-4-

the actionable misconduct and liability of a private person or corporation. Norg v. City of Seattle, 200 Wn.2d 749, 756, 522 P.3d 580 (2023). A significant challenge in determining whether a governmental entity may be liable in tort is that "governments, unlike private persons, are tasked with duties that are not actionable duties within the meaning of tort law." Norg, 200 Wn.2d at 757 (quoting Beltran-Serrano v. City of Tacoma, 193 Wn.2d 537, 549, 442 P.3d 608 (2019)).

Thus, the public duty doctrine is a tool to ensure that government entities are held liable only to the same extent as if they were a private person or corporation. Norg, 200 Wn.2d at 758. As the Supreme Court explained:

> If the duty that the government allegedly breached was owed to the public at large, then the public duty doctrine applies; if the duty was owed to an individual, then the public duty doctrine does not apply. This is a potentially "dispositive" issue because if the public duty doctrine applies, the negligence claim must be dismissed for lack of an actionable duty unless there is an applicable exception.

Norg, 200 Wn.2d at 758. There are four general exceptions to the public duty doctrine: (1) failure to enforce, (2) legislative intent, (3) the rescue doctrine, and (4) a special relationship. Munich v. Skagit Emergency Commc'n Ctr., 175 Wn.2d 871, 879, 288 P.3d 328 (2012). VCC does not dispute that it is a government entity performing governmental duties. Therefore, the issue turns on whether an exception to the public duty doctrine applies.

B

The Estate argues that it pleaded sufficient facts to establish that the special relationship exception is applicable and met. We agree.

The special relationship exception allows tort actions for the negligent performance of public duties if the plaintiff can prove that there are circumstances setting their relationship with the government apart from the general public. Cummins v. Lewis County, 156 Wn.2d 844, 854, 133 P.3d 458 (2006). A special relationship imposing an actionable duty to perform arises between the plaintiff and a government entity when "'(1) there is a direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff.'" Cummins, 156 Wn.2d at 854 (internal quotation marks omitted) (quoting Beal v. City of Seattle, 134 Wn.2d 769, 785, 954 P.2d 237 (1998)). Each of these elements is addressed in turn.

1

In the context of the public duty doctrine, "privity" refers to the relationship between the government actor and "any reasonably foreseeable plaintiff." Babcock v. Mason County Fire Dist. No. 6, 144 Wn.2d 774, 787, 30 P.3d 1261 (2001). Therefore, a plaintiff can establish privity without needing to prove the plaintiff communicated with the government entity. Cummins, 156 Wn.2d at 855. Accordingly, where a public entity negligently responds to a request for assistance, this court broadly construes privity to encompass the relationship between the entity and a person it should reasonably foresee may be harmed by its breach. Mita v. Guardsmark, LLC, 182 Wn. App. 76, 85-86, 328 P.3d 962 (2014).

For example, in Bratton v. Welp, 145 Wn.2d 572, 575, 39 P.3d 959 (2002), the plaintiff called 911 to report threatening behavior by a neighbor. The dispatcher told the

plaintiff that "if she or her family was threatened again that the police would be sent." Bratton, 145 Wn.2d at 575. A few days later, the plaintiff's brother called to report threatening behavior by the neighbor, but the plaintiff was shot as her brother was talking to the operator. Bratton, 145 Wn.2d at 575.

The plaintiff sued the county arguing that there were express assurances of assistance and that police failed to provide timely assistance. Bratton, 145 Wn.2d at 575. Division Three of this court held that because the plaintiff did not directly speak with the 911 operator on the date of the shooting, there were no express assurances made to her, so the negligence claim failed. Bratton v. Welp, 106 Wn. App. 248, 257, 23 P.3d 19 (2001). The Supreme Court reversed and rejected the Court of Appeals' reasoning that there was no privity or express assurance because the plaintiff did not personally call 911 the second time and did not know her brother called. Bratton, 145 Wn.2d at 577. The court noted that she was a plainly foreseeable plaintiff. Bratton, 145 Wn.2d at 577. Therefore, the court held that there was a genuine issue of material fact as to whether the plaintiff justifiably relied on the 911 operator's statements. Bratton, 145 Wn.2d at 577.

In contrast, in Cummins, a man called 911, stated an address, said "heart attack," and then hung up before the dispatcher could respond. 156 Wn.2d at 848-49. The court held that there was no privity because the man hung up before there could be a promise of assistance or before an ongoing dialogue could be established. Cummins, 156 Wn.2d at 855. The court rejected the argument that there is an inherent assurance that medical assistance will come after a 911 call is placed. Cummins, 156 Wn.2d at 856.

The Estate asserts that Keith and VCC were in privity. VCC disagrees arguing that there was no direct contact or privity between Keith and VCC.

Privity is broadly construed. Roush made the calls to VCC on behalf of Keith. VCC knew that the person being attacked in room 214, Keith, was the individual who needed assistance. Like in Bratton, Keith was a reasonably foreseeable plaintiff. And unlike Cummins, there was an ongoing dialogue about the incident. Contrary to VCC's argument, there does not need to be direct communication with Keith in order to establish privity. Therefore, for the purposes of the special relationship doctrine, the Estate has sufficiently pleaded facts to establish privity.

2

The next element is whether VCC provided express assurances. Cummins, 156 Wn.2d at 854.

Courts have concluded that the special relationship exception was met when there were assurances given by the 911 operator that help was on the way. For example, in Munich, the plaintiff alleged the 911 operator negligently responded to an emergency call by prioritizing it incorrectly, which caused a delayed response. 175 Wn.2d at 874. The operator told the caller that help was on the way but made no reference to the call's priority. Munich, 175 Wn.2d at 874. The court held that "[i]n a 911 case like this, the express assurance element is satisfied when the operator assures the caller law enforcement officers are on their way or will be sent to the caller's location." Munich, 175 Wn.2d at 884.

Similarly, in Beal, the victim called 911 and asked the police for assistance in removing her belongings from her estranged husband's apartment because he had

been threatening her and had a gun.  134 Wn.2d at 773-74.  She waited outside for the police to arrive when her husband shot and killed her.  Beal, 134 Wn.2d at 774.  The victim's estate sued alleging that the City's failure to dispatch a police officer promptly in response to the 911 call was a breach of a duty owed to her as an individual.  Beal, 134 Wn.2d at 774.  The Supreme Court found there was a special relationship established by the assurances of police protection given by the operator:

> 911: Okay.  Well I'll tell you what, we're going to send somebody there.
> Are you going to wait in number 4 [another apartment] until we get there?
> CALLER: I'll be waiting outside in the front with my mom.
> 911: Okay.  We'll get the police over there for you okay?
> CALLER: Alright [sic], thanks.

Beal, 134 Wn.2d at 785 (alterations in original).  Accordingly, the court held the public duty doctrine did not bar the claim.  Beal, 134 Wn.2d at 788.

The Estate argues that a reasonable fact finder could conclude that there were express assurances.  In response, VCC argues there was no express assurance made directly to Keith.

According to the complaint, VCC Employee 1 told Roush that they were dispatching help and going to get there as quickly as they can.  Under Munich, this is sufficient to meet the express assurances requirement. 175 Wn.2d at 884.  VCC asserts that Keith had no contact with VCC, so she could never have received express assurances.  But there is no requirement that the express assurance be made to the victim.  Additionally, this is conflating the express assurance requirement with the privity requirement.  It is enough that the VCC employee told Roush that emergency assistance was on the way for Keith.

-9-

3

The last element that the Estate must demonstrate is that there was justifiable reliance on the express assurance given by the 911 operator. See Cummins, 156 Wn.2d at 856. Whether a party justifiably relies on information is a fact question generally not amenable to summary judgment. Beal, 134 Wn.2d at 786-87.

Courts have found justifiable reliance when there was an express assurance that induced reliance. For example, in Beal, the court found that there was justifiable reliance when the 911 operator gave assurance that police protection was on the way and the shooting victim consciously waited for officers to arrive at that location based on that assurance. 134 Wn.2d at 786. Similarly, in Noakes v. City of Seattle, 77 Wn. App. 694, 700, 895 P.2d 842 (1995), the court found justifiable reliance when the plaintiffs remained in the house waiting for police assistance rather than attempting to escape or trying to remove the intruder by themselves.

In contrast, in Cummins, the court found no justifiable reliance when there was no evidence the victim received an express assurance or was induced to remain at his physical location awaiting help. 156 Wn.2d at 856-57. Similarly, in Babcock, the court found there was no justifiable reliance when a firefighter told a homeowner that the firefighters would protect his property, but the fire was intense and unpredictable and the homeowner moved his truck after being told not to, demonstrating that he did not rely on the firefighter's statements. 144 Wn.2d at 793-94.

Here, Roush called VCC two times after the first call when police still had not arrived and he still heard violent sounds from the room. Roush kept his ear up against the door because "he was trying to save Ms. Keith's life." It is also hypothetically

-10-

conceivable that Roush did not take other action because he believed that emergency assistance was on the way or that Roush informed Keith that help was coming or induced other people not to call 911 because they were on the way. We hold that a plaintiff must prove that justifiable reliance existed by the person to whom the express assurance was given. Therefore, in this case, it was sufficient for the Estate to demonstrate that Roush relied on VCC's express assurance.

For these reasons, we reverse the trial court's dismissal of the Estate's negligence claim.

III

The Estate argues that the trial court erred in dismissing its claims for negligent training, supervision, policies, and procedures. We disagree.

A claim against an employer for negligent training and supervision must be based on an employee's tortious conduct occurring outside the scope of employment. Evans v. Tacoma Sch. Dist. No. 10, 195 Wn. App. 25, 47, 380 P.3d 553 (2016). Here, there is no allegation that any VCC employee was not acting within their scope of employment when they engaged in the alleged injurious conduct. VCC relies on Harris v. Federal Way Public Schools, 21 Wn. App. 2d 144, 505 P.3d 140 (2022) for the proposition that a negligent training and supervision claim may exist independently of vicarious liability when there is a special relationship. But in that case, the court was discussing the duty school districts have to protect students in their custody from foreseeable harm, which is independent of a vicarious liability claim. This case does not apply, and because there is no allegation that the employees were not acting within the

-11-

scope of their employment, this claim fails.  For those reasons, the trial court did not err in dismissing these claims.

Accordingly, we reverse the trial court's dismissal of the Estate's negligence claim and affirm the trial court's dismissal of the negligent supervision and training claim.

Mann, J.

WE CONCUR:

Birk, J.