

2016 APR 18 AM 11:4...

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| KARY L. CALDWELL, | ) | No. 71947-5-I |
|  | ) |  |
| Respondent, | ) | DIVISION ONE |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| CITY OF HOQUIAM, a governmental entity, | ) | UNPUBLISHED |
|  | ) |  |
|  | ) | FILED: April 18, 2016 |
| Appellant, | ) |  |
|  | ) |  |
| and | ) |  |
|  | ) |  |
| GRAYS HARBOR COUNTY, a governmental entity; JENNIFER M. SMITH and JOHN DOE SMITH, individually and the marital community composed thereof; SHAWN M. SMITH and JOHN DOE SMITH, individually and the marital community composed thereof; and JAMES THOMPSON and JANE DOE THOMPSON, individually and the marital community composed thereof, | ) | |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

Cox, J. — Kary Caldwell suffered substantial injuries when she was attacked by a dog in Kent, Washington. The City of Hoquiam had previously declared that animal a "dangerous dog" under its municipal code. This personal injury action followed the attack.

The trial court granted Caldwell partial summary judgment, concluding that the City owed her a duty, under its municipal code and state law, to immediately impound the dog when the City declared it a "dangerous dog." We disagree. Accordingly, we reverse the partial summary judgment order and the judgment on the jury verdict in Caldwell's favor that followed.

As a threshold matter, we note that this appeal is not about the negligence of the dog's owner. Likewise, this is not about the negligence of others in whose care the dog was placed at the time of the attack. And the severity of Caldwell's injuries is unquestioned. These matters were resolved below, and no one takes issue with them in this appeal.

The focus of this appeal is whether the City owed a duty to Caldwell, either under its municipal code or state law, to immediately impound the dog when the City's animal control officer served the owner with a "dangerous dog" declaration. Accordingly, we focus on that question.

The material facts are largely undisputed. Shawn Smith owned two dogs, named Temper[1] and Yayo. In February 2009, Smith called 911 to report that her two dogs were fighting. Robert Hill, the City of Hoquiam's animal control officer, responded and separated the dogs. Officer Hill also informed Smith that he declared Temper a "potentially dangerous" dog under the municipal code because it had injured Yayo, another animal. The following day, Officer Hill

---

[1] In the record, this dog's name is also sometime spelled as "Tempur." For consistency, we refer to the dog as "Temper" throughout this opinion.

returned to the residence to serve the written potentially dangerous dog declaration. But he was unable to locate Smith to serve her at that time.

On August 11, 2009, Officer Hill once again responded to a report that Smith's dogs were fighting. He again separated the dogs. He also informed Smith that because Temper had been previously declared a "potentially dangerous" dog, he now declared that Temper was a "dangerous dog." He served Smith with a "dangerous dog" declaration on that day. It stated, among other things, that the declaration would become final unless it was appealed within 10 days. He did not immediately impound Temper.

Smith timely appealed the declaration to the municipal court. The court concluded that Temper was a "dangerous dog" under the municipal code. The court's order, entered on September 1, 2009, required Smith to comply with the municipal code dangerous dog regulations by September 10.

On September 14, Officer Hill returned to Smith's residence to determine whether she was complying with the dangerous dog regulations, as the court order directed. But no one was present at the residence.

When he returned to the property two days later, he learned that Smith no longer lived there and was looking for a new residence. Although, Officer Hill asked the residence's owner to tell Smith to contact him, this record does not show any further contact by Smith or the dog with the City.

Some two weeks later, Kary Caldwell visited her friend at an apartment in Kent, Washington. Temper was in the apartment. The dog attacked Caldwell, severely injuring her arm. Caldwell required extensive medical attention.

Caldwell commenced this action against the City, those who owned or took care of Temper, and others. She obtained default judgments against Smith, her daughter, and the resident of the apartment where she was attacked.

Caldwell moved for summary judgment, arguing that the City owed her a duty, under both its municipal code and state law, to immediately impound the dog on declaring it a "dangerous dog." She also claimed that the City breached that duty to her. The City argued it had no duty.

The court granted partial summary judgment in favor of Caldwell solely on the question of duty. The court decided that the duty arose "on or after August 11, 2009 [the date of service of the dangerous dog declaration]." The questions of breach, damages, and proximate cause were reserved for later determination.

At trial, a jury returned a substantial verdict in Caldwell's favor against the City. The trial judge entered judgment on that verdict.

The City appeals.

## DUTY

The City argues that it did not owe Caldwell a duty under either its municipal code or state law. The City is correct.

As in any personal injury case, a plaintiff must generally establish four elements: duty, breach, damages, and causation.[2] This appeal focuses on the first of these elements.

---

[2] See Lowman v. Wilbur, 178 Wn.2d 165, 169, 309 P.3d 387 (2013).

Whether a duty exists is a question of law.[3] We review de novo questions of law.[4]

Washington has legislatively abolished sovereign immunity.[5] Under RCW 4.96.010(1), local governments are liable for their tortious conduct "to the same extent as if they were a private person or corporation."

If the defendant is a governmental entity and "a statute, ordinance, or regulation" creates the alleged duty, the public duty doctrine applies.[6] Under this doctrine, a duty owed to the general public does not create liability. Instead, the governmental entity must owe a duty specifically to the plaintiff to be liable.[7] This doctrine "is simply a tool [courts] use to ensure that governments are not saddled with greater liability than private actors as they conduct the people's business."[8]

At issue in this appeal is the failure to enforce exception to the public duty doctrine.[9] Under this exception, a government entity owes a duty to the plaintiff when "'[1] governmental agents responsible for enforcing statutory requirements

---

[3] Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wn.2d 506, 528, 799 P.2d 250 (1990).

[4] Lyons v. U.S. Bank Nat. Ass'n, 181 Wn.2d 775, 783, 336 P.3d 1142 (2014).

[5] RCW 4.92.090; RCW 4.96.010.

[6] Munich v. Skagit Emergency Commc'n Ctr., 175 Wn.2d 871, 886, 288 P.3d 328 (2012) (Chambers, J. concurring).

[7] Id. at 878.

[8] Id. at 886.

[9] Opening Brief of Appellant City of Hoquiam at 11-12; Brief of Respondent Caldwell at 30-31.

[2] possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and [3] the plaintiff is within the class the statute intended to protect.'"[10] The plaintiff must establish each element of this exception.[11] Courts construe this exception narrowly.[12]

The narrow question in this case is whether either the City's municipal code or the state statute mandated Temper's immediate impoundment when the City's animal control officer served the dog's owner with the "dangerous dog" declaration on August 11, 2009.

Construction of a statute is a question of law that this court reviews de novo.[13] We construe municipal ordinances and state statutes under the same standards.[14] Our fundamental objective is to ascertain and carry out the legislative body's intent.[15] If the meaning of a statute's text is plain, we effectuate that meaning.[16] We avoid reaching absurd results when interpreting statutes.[17]

---

[10] Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs., 115 Wn.2d at 531 (alterations in original) (quoting Honcoop v. State, 111 Wn.2d 182, 190, 759 P.2d 1188 (1988)).

[11] Id.

[12] Id.

[13] Citizens All. for Prop. Rights Legal Fund v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015).

[14] World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 392, 816 P.2d 18 (1991).

[15] Citizens All. for Prop. Rights Legal Fund, 184 Wn.2d at 435.

[16] Id.

[17] Tingey v. Haisch, 159 Wn.2d 652, 663-64, 152 P.3d 1020 (2007).

We now consider each of these statutes.

*City Code*

The City argues that it did not have an immediate duty to impound Temper at the time it served the dangerous dog declaration. We agree.

HMC 3.40.080 regulates "[d]angerous and potentially dangerous dogs." Subsection (6) of this provision states:

> A dangerous dog **shall** be **immediately impounded** by a police officer or an animal control officer if the owner of the dangerous dog fails to comply with any of the restrictions set forth in **subsection (5)(a), (b), (c), (d), or (e) of this section.**[18]

HMC 3.40.080(5), to which subsection (6) refers, states:

> The following restrictions **shall** apply to a dog that has been declared dangerous:

> (a) The owner shall provide and maintain a proper enclosure for the dangerous dog, as defined in HMC 3.40.040(13); and (b) The owner shall post his or her premises with a clearly visible warning sign that states that there is a "Dangerous Dog" on the property. In addition, the owner shall conspicuously display a sign with a warning symbol approved by the animal control officer that informs children of the presence of a dangerous dog; and (c) The owner shall maintain a surety bond or liability insurance policy, as defined by RCW Title 48, in an amount of two hundred fifty thousand dollars payable to any person injured by the dangerous dog; and (d) The owner of the dangerous dog shall obtain a dangerous dog license from the city under HMC 3.40.050; and (e) The owner shall not permit the dangerous dog to be outside a proper enclosure unless the dog is muzzled and restrained by a substantial chain or leash and is under physical restraint of a responsible person. The muzzle shall be made in a manner that will not cause injury to the dog or interfere with its vision or respiration, but shall prevent it from biting any person or animal.[19]

---

[18] (Emphasis added.)

[19] (Emphasis added.)

7

These provisions specify the circumstances under which the municipal code requires the immediate impoundment of a dangerous dog. The word "shall" in these provisions is mandatory.[20]

Subsection (6)'s plain words condition the immediate impoundment of a dangerous dog on its owner's failure to comply with *any* of the provisions of the five paragraphs under subsection (5) of the code.

Notably, subsection (6) does not direct immediate impoundment of a dog merely upon service of its owner with a dangerous dog declaration. Rather, the words of this subsection plainly require that a duty to immediately impound a dog arises when two things occur. First, the City must serve the owner of the dog with a dangerous dog declaration. Second, the owner must fail to comply with "any" of the provisions of subsection (5). In the absence of either of these requirements, no duty arises.

Applying this interpretation to the facts of this case, it is difficult to see how a duty to immediately impound Temper arose on August 11, 2009. Officer Hill testified at deposition that he served Smith with the dangerous dog declaration on that date. During his deposition, he also testified whether Smith met certain provisions of subsection (5) on the day he served her in response to counsel's questions:

> [Counsel:] Did—on August 11, 2009, did Shawn Marie Smith have any signs posted warning the community about Temp[e]r?
>
> [Officer Hill:] No.
>
> [Counsel:] Were there any Dangerous Dog signs anywhere in her

---

[20] State v. Blazina, 182 Wn.2d 827, 838, 344 P.3d 680 (2015).

residence at [her address]?

[Officer Hill:] No.

. . . .

[Counsel:] Did—on August 11, 2009, did Shawn Marie have any liability insurance coverage?

[Officer Hill:] I wouldn't know that.

[Counsel:] Did you ask her?

[Officer Hill:] Why would I ask her?

[Counsel:] Did you ask her if she had any liability insurance coverage at the time?

[Officer Hill:] No.

[Counsel:] Did you ask her if she had renter's insurance?

[Officer Hill:] No.

[Counsel:] Did you ask her if she had homeowner's insurance?

[Officer Hill:] No.

[Counsel:] Did you ask her if she was employed?

[Officer Hill:] No.

[Counsel:] Do you know if she was employed?

[Officer Hill:] I do not.[21]

Fairly read, the undisputed evidence shows that when Hill served Smith with the dangerous dog declaration there was no signage on her property of the type subsection (5) requires. Moreover, this record shows that it is unclear

---

[21] Clerk's Papers at 121.

whether she met subsection (5)'s other requirements. Officer Hill simply had no personal knowledge about these requirements other than signage.

The parties dispute whether the absence of the signage described in subsection (5) constitutes Smith's failure to comply with that subsection, triggering the City's duty to immediately impound Temper. The City argues that an owner, served with the required declaration, must have a reasonable time after service to comply with the regulations. Caldwell responds that "Smith never complied nor had the capability or intent of complying." We agree with the City on this point.

To read the code to require instantaneous or near-instantaneous compliance with the regulations set forth in subsection (5) after service of the dangerous dog declaration makes no sense. The five paragraphs under this subsection specify different requirements that likely would take different time periods to meet. For example, obtaining the required insurance might take longer than obtaining the required signage to post on the property. Even obtaining the required signage might take different periods of time, particularly where the City must approve certain signs, as HMC 3.40.080(5)(b) requires. Thus, Caldwell's argument that the City code required immediate impoundment of this dog on August 11, 2009 is unpersuasive.

Caldwell does not appear to rely on any other time to contend that the City owed her a duty to immediately impound this dog.

This record establishes that the municipal court's September 1, 2009 order following Smith's appeal specified that she had until September 10 to

10

comply with subsection (5)'s requirements. Caldwell does not argue that the City failed to impound the dog during this period, although there is no evidence that the City did so at this time.

In any event, Officer Hill's deposition testimony establishes that both Smith and the dog where gone when he went to check on compliance with the municipal court's order after the grace period expired. Thus, it is difficult to see how Hill could have either had actual knowledge of a statutory violation or impounded Temper during this period.

Another fundamental dispute between the parties regarding duty centers on the effect, if any, of the period of time to appeal a dangerous dog declaration. The City maintains that certain provisions of HMC 3.40.080(4) would be rendered meaningless if service of this declaration triggered a duty to immediately impound the dog.[22] Caldwell responds by arguing a dog must be immediately impounded on service of the declaration unless its owner complies with subsection (5).[23] We again agree with the City.

HMC 3.40.080(4) provides that "[a] declaration that a dog is dangerous shall be final *unless* appealed by the owner or person in control of the dog within ten days of service." Thus, a fair reading of this provision is that the declaration cannot be final during the ten days following service. To read this provision otherwise requires that we conclude that the declaration becomes "final" for the

---

[22] Opening Brief of Appellant City of Hoquiam at 25-27.

[23] Brief of Respondent Caldwell at 26.

ten day period following service and prior to a possible appeal. This we decline to do.

If the owner timely appeals, the municipal court holds a hearing to determine the dog's dangerousness.[24] The time in which the court must schedule the hearing depends on whether the City impounded the dog. If the dog has been impounded, the hearing must occur within ten days of receipt of the notice of appeal.[25] If the dog has not been impounded, the hearing must occur within 30 days.[26] A dog impounded as a dangerous dog cannot be redeemed prior to a municipal court hearing.[27]

If service of a dangerous dog declaration required immediate impoundment of a dog, the provision for scheduling a hearing within thirty days of receipt of the notice of appeal if the dog is not impounded would be meaningless. That is because this provision only applies when a dog is not impounded.

As we explained earlier in this opinion, service of the declaration does not trigger a duty to immediately impound a dog. Rather, an owner's failure to comply with the regulations of subsection (5) within a reasonable time after service of the dangerous dog declaration requires immediate impoundment.

Harmonizing these provisions, as we must, we conclude that a dangerous dog declaration that may be timely appealed is not final. Thus, there is no duty to

---

[24] HMC 3.40.080(4).

[25] Id.

[26] Id.

[27] HMC 3.40.150(3).

enforce such a declaration upon service by immediately impounding a dog under HMC 3.40.080(6)'s provisions.

Here, the dangerous dog declaration was the subject of a timely appeal by Smith. The City did not owe Caldwell a duty based on its failure to enforce HMC 3.40.080 on August 11, 2009 because the declaration was not then final.

Caldwell argues HMC 3.40.080 does not provide a stay pending appeal. But this argument begs the question—a stay is necessary only if the dangerous dog declaration is final when served.

Here, the relevant question is whether a dangerous dog declaration is final immediately when served. For the reasons explained earlier, it is not. Thus, lack of a "stay" is immaterial—the declaration does not need to be stayed because it is not yet final.

*State Law*

The City argues that it did not owe Caldwell a duty under state law. We agree.

RCW 16.08.100 requires animal control officers to confiscate "dangerous dogs" if their owners fail to comply with certain conditions.

For the purposes of this statute, a dog is dangerous if it:

(a) inflicts severe injury on a human being without provocation on public or private property,

(b) kills a domestic animal without provocation while the dog is off the owner's property, or

(c) has been previously found to be potentially dangerous because of injury inflicted on a human, the owner having received notice of

13

such[,] and the dog again aggressively bites, attacks, or endangers the safety of humans.[28]

Temper was not a "dangerous" dog under any of the above definitions of the state law. Through September 2009, the time period when the dog was arguably within the City's jurisdiction, none of the above definitions applied.

Animal control had twice received reports that Temper had attacked another dog. But Temper had not either attacked a human or killed another animal. Thus, it did not fall under sections (a) or (b).

Temper also did not fall under section (c). While Temper had been previously declared potentially dangerous, this was not "because of injury inflicted on *a human*."[29] Thus, Temper was not a dangerous dog under state law.

For these reasons, there is no duty under state law that the City owed to Caldwell.

*Common Law*

Caldwell also argues that the City owed her a duty under the common law. But she fails to articulate a duty owed to her independent of the City's statutory duty to enforce the dangerous dog restrictions.

The court granted Caldwell summary judgment solely on the basis of the city code and state law. It did not determine that the City owed her a duty under the common law.

---

[28] RCW 16.08.070(2).

[29] RCW 16.08.070(2)(c) (emphasis added).

14

In her motion for summary judgment, Caldwell argued that "[w]hen the City declared Temp[e]r to be a Dangerous Dog and Temp[e]r's owners were in violation of the Dangerous Dog restrictions, the City had a common law duty to take reasonable measures to prevent an attack from taking place." Similarly, on appeal she argues that "[a]bsent the City's proper enforcement of state law and its own ordinance" it was foreseeable that Smith would fail to restrain Temper. She further argues that "parties must avoid exposing others to harm from the foreseeable conduct of third parties."

But Caldwell merges two separate concepts—foreseeability and duty. Foreseeability determines a duty's scope.[30] But foreseeability by itself does not create a duty.[31] Thus, even assuming it was foreseeable that Temper would cause harm, this foreseeability does not create a common law duty on the City.

Caldwell's arguments on duty depend on the existence of the dangerous dog restrictions. Thus, any duty is created by "a statute, ordinance, or regulation."[32] There is no separate common law duty.

Both parties make additional arguments on appeal. Because of our disposition, it is not necessary for us to address those other arguments, with one exception.

---

[30] Halleran v. Nu W., Inc., 123 Wn. App. 701, 717, 98 P.3d 52 (2004).

[31] Id.

[32] Munich, 175 Wn.2d at 886.

Caldwell states in her briefing that this court could conclude that the legislative intent exception to the public duty doctrine could also apply to the question of duty.[33] On the briefing that is before us, we do not reach that question. All that we decide is whether the City owed Caldwell a duty under the failure to enforce exception of the public duty doctrine.

Accordingly, we conclude, on the basis of that question only, that reversal of the partial summary judgment order in favor of Caldwell and the judgment of the jury verdict that followed are appropriate. Moreover, denial of the motion for summary judgment of the City on that question only was incorrect.

## ATTORNEY FEES

Caldwell seeks attorney fees on appeal. Specifically, she argues that the City's appeal is frivolous. We hold that its appeal is not frivolous.

Parties in Washington may recover attorney fees if a statute, contract, or recognized ground of equity authorizes the award.[34] Under RAP 18.9(a), "[a]n appellate court may order a party to pay compensatory damages or terms for filing a frivolous appeal."[35] "An appeal is frivolous if, considering the entire record, the court is convinced that the appeal presents no debatable issues upon which reasonable minds might differ and that it is so devoid of merit that there is

---

[33] Brief of Respondent Caldwell at 31 n.41.

[34] LK Operating, LLC v. Collection Grp., LLC, 181 Wn.2d 117, 123, 330 P.3d 190 (2014).

[35] Lutz Tile, Inc. v. Krech, 136 Wn. App. 899, 906, 151 P.3d 219 (2007).

no possibility of reversal."[36]  This court resolves doubts whether an appeal is frivolous in favor of the appellant.[37]

For the reasons we have already discussed in this opinion, the issues were debatable and had merit.  There is no basis for an award.

We reverse the partial summary judgment in Caldwell's favor and the judgment on the jury verdict that followed.  We deny Caldwell's request for attorney fees and remand for such further proceedings as are appropriate.

_Cox, J_

WE CONCUR:

_Schindler, J_  _Becker, J._

---

[36] Id.

[37] Id.